## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **JERRY CINTRON** | : | |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **C.A. No. 19-497-WES** |
| | : | |
| **PAUL BIBEAULT, in his official and** | : | |
| **Individual capacity, et al,** | : | |
| *Defendants* | : | |

### DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

NOW COME, the Defendants, Paul Bibeault, Steve Cabral, Rui Diniz, Matthew Kettle, Patricia Coyne-Fague, Jeffrey Aceto, and Lynne Corry, each in their official and individual capacities (hereinafter, "Defendants"), and move for judgment on the pleadings in this lawsuit filed by Plaintiff Jerry Cintron ("Plaintiff" or "Mr. Cintron").  Plaintiff consumed and overdosed on fentanyl on July 12, 2019 while an inmate at the Adult Correctional Institutions ("ACI") and was subsequently disciplined, including for participating in trafficking narcotics into the ACI. Plaintiff later filed this lawsuit, which pertains, *inter alia*, to the disciplinary bookings he received for possessing and trafficking narcotics into the ACI, and a related state court criminal prosecution of him for conveying narcotics into the ACI, both of which Plaintiff alleged were the result of retaliation against him by some of the Defendants.   In his Second Amended Complaint ("Complaint"), filed in February 2021, Plaintiff admitted that he consumed fentanyl, but asserted that he had no involvement in bringing the narcotics on which he overdosed into the ACI.  ECF 38 ¶ 25.  On March 31, 2022, Plaintiff pleaded guilty in Rhode Island Superior Court to causing and conspiring to have fentanyl conveyed into the ACI on or about July 10, 2019.  Despite having finally admitted that he participated in conveying fentanyl into the ACI two days before overdosing on fentanyl, Plaintiff continues to pursue this lawsuit alleging that he was booked and prosecuted

1

for conveying narcotics due to retaliation.  Plaintiff also recently filed a legal memorandum with this Court, ECF 47, which provided additional clarity regarding the nature of the claims he is asserting in this lawsuit.  In light of these latest developments, it is clear that each count of Plaintiff's Complaint fails to state a claim and that Defendants are entitled to judgment on the pleadings.

## BACKGROUND

### A. Plaintiff Was Investigated and Criminally Prosecuted for Conveying Narcotics into the ACI

Plaintiff is an inmate at the ACI and has been during all relevant times.  On July 12, 2019, Plaintiff admittedly consumed fentanyl while incarcerated at the ACI.  *See* Complaint, ECF 38 ¶ 19.  Plaintiff was found unconscious, taken to Rhode Island Hospital for a suspected drug overdose, and was revived with multiple doses of Narcan.  *See* ECF 38 ¶ 19; *see also* Exhibit A, p.6 (Criminal Information filed in *State of Rhode Island v. Jerry Cintron*, P2-2021-0683A).[1]  Tests at Rhode Island Hospital confirmed that Plaintiff had fentanyl in his system, which had not been administered to him for any official medical purpose.  Exhibit A, p.6 (signed and sworn police narrative).

Investigators at the ACI conducted an investigation, including into how the fentanyl Plaintiff consumed entered the ACI.  *See id.*  "Investigators received information that Cintron received the fentanyl with the aid of another inmate identified as Davante Neves .... Investigators began listening to archived telephone calls of both Cintron and Neves and discovered a conspiracy

---

[1] The Criminal Information filed in the Rhode Island Superior Court has been stamped with page numbers for ease of reference.  The Criminal Information is an official document filed on the docket of the Rhode Island Superior Court and can properly be considered in the context of this Motion for Judgment on the Pleadings.  *See infra* p.9-10.  The Criminal Information was also previously filed in this Court as Exhibit A to Defendants' Motion to Stay, ECF 44.  The information cited from the Criminal Information is chiefly offered for background purposes and to provide understanding of the nature and outcome of the related criminal proceedings.

to convey fentanyl into the facility." *Id.* "During the investigation, SI Bibeault received information from a confidential source that Cintron was 'tight' with inmate Davante Neves," who would "often brag to him about how his girlfriend 'Destiny Valley' would convey narcotics into the facility." *Id.*, p.10. "Investigators identified third party, Rafael Ferrer [], who was under investigation by the FBI Safe Streets Task Force for narcotics distribution." *Id.,* p.6. Based on the series of phone calls, investigators learned that two days prior to Mr. Cintron's overdose, Ferrer had supplied fentanyl and provided transportation to the ACI to a woman who was a known associate of Neves[, Destiny Valley,] who conveyed the fentanyl into the facility during a routine visit with Neves, who then sold the fentanyl to Cintron. *Id.* "The investigation also revealed that Cintron sold fentanyl to at least one other inmate who also tested positive for fentanyl. Neves later contacted his associate and expressed concern that Cintron had overdosed and advised the associate not to visit him or cooperate with police." *Id.*

The Criminal Information includes transcripts of audio calls listened to by the investigators, which show Plaintiff and his co-conspirators planning and then discussing the aftermath of the conveyance of the narcotics into the prison. *See id.*, p.11-23. For instance, the audio transcripts include one telephone call between Mr. Cintron and Mr. Ferrer, two days before Plaintiff's overdose, where Mr. Cintron tells Mr. Ferrer "That person is going to give you the boom," to which Mr. Ferrer responds, "Enough enough, enough, enough, . . . Enough, that's already been ironed out, enough." Exhibit A, p.15. Mr. Cintron then instructs Mr. Ferrer to "[k]eep her all the way to the end" to which Mr. Ferrer responds, "I already know that." *Id.*

The Criminal Information also includes the Special Investigations Unit ("SIU") report filed by Investigator Bibeault regarding SIU's investigation of the narcotics trafficking. *See id.*, p.52. The report concludes that the evidence demonstrated that Plaintiff and another inmate had

conspired to traffic narcotics into the facility.  *See id.*, p.59.  Between July and August 2019, Plaintiff received several disciplinary bookings related to his possession of an illicit substance, as well as for engaging in an organized effort to traffic narcotics into the ACI.  *See id.*, p.63; ECF 38 ¶¶ 27-28, 53.

The narrative of Rhode Island State Police Corporal Herbert Tilson describes how he, along with Investigator Bibeault, subsequently continued to investigate the conveyance of the narcotics, including by talking again in September 2020 with Destiny Valley, who brought the narcotics to the ACI, and to Craig Kelly, who also tested positive for fentanyl at the time when Plaintiff overdosed.  *See* Exhibit A, p.23.

On October 7, 2020, the Office of Attorney General initiated a Rule 32(f) probation violation proceeding against Mr. Cintron in connection with two of his prior criminal cases.  *See* P2-2016-1525A; P2-2013-2153AG.  On February 10, 2021, Mr. Cintron's criminal lawyer filed a Motion to Dismiss the violation action, citing Rhode Island's Good Samaritan Overdose Prevention Act, discussed *infra*.

On March 9, 2021, the Office of Attorney General filed Criminal Information in a new criminal case, P2-2021-0683A, charging Plaintiff with four counts: (1) conveying an unauthorized article (Fentanyl) into the ACI., *see* R.I. Gen. Laws § 11-25-14; (2) conspiracy to convey an unauthorized article to or from the ACI, *see* R.I. Gen. Laws § 11-1-6; (3) delivery of a controlled substance (Fentanyl), *see* R.I. Gen. Laws § 21-28-4.01(a)(4)(i); and (4) conspiracy to violate the Controlled Substances Act, *see* R.I. Gen. Laws § 21-28-4.08.  *See* Exhibit A, p.1-2.[2]

---

[2] A criminal complaint was originally filed in the District Court on October 7, 2020 and later removed to the Superior Court.  *See* Case No. 32-2020-06674.

On April 15, 2021, Mr. Cintron's criminal attorney filed a Motion to Dismiss the criminal charges in P2-2021-0683A, asserting there was a lack of probable cause for the criminal charges against Mr. Cintron.  *See* Exhibit B, p.6-10[3] (transcript of Superior Court hearing and ruling on Motion to Dismiss).  The Motion also argued that the criminal charges should be dismissed based on the Good Samaritan Overdose Prevention Act, R.I. Gen. Laws § 21- 28.9-4(a),[4] arguing that "[a]ll of the evidence for the charges contained in the information was obtained 'as result' of Mr. Cintron's need for medical assistance."  *See* P2-2021-0683A.  The Superior Court issued a decision on the Motion to Dismiss on May 28, 2021.  Regarding Counts I and II, the Superior Court determined that the Good Samaritan Act did not apply and held that "a review of the information package, as discussed at the outset of this decision, in the light most favorable to the State makes it clear that probable cause exists as to Counts l and 2 in this case."  Exhibit B, p.23-25.  The Superior Court also recounted the evidence supporting Counts III and IV, but determined that the evidence was gathered as a result of Plaintiff's overdose, and thus granted the Motion to Dismiss as to Counts III and IV based on the Good Samaritan Act.  *See* Exhibit B, p.30-34.  On July 1, 2021, the Office of Attorney General filed an appeal of the dismissal of Counts III and IV based on the Good Samaritan Act.

## B.  Plaintiff's Lawsuit Against Defendants

Plaintiff initially commenced this lawsuit against the Defendants on September 20, 2019, shortly after he was disciplined for the conduct at issue in this case.  *See* ECF 1.  Plaintiff filed the operative Second Amended Complaint in this lawsuit on February 12, 2021.  *See* ECF 38.  As

---

[3] Page references are to the numbered transcript pages.
[4] Rhode Island's Good Samaritan Act provides that an individual that experiences a drug overdose shall "not be charged or prosecuted for any crime related to the possession of controlled substance or drug paraphernalia, or the operation of drug-involved premises, if the evidence for the charge was gained as result of the seeking of medical assistance."

more specifically discussed below, the Complaint asserts seven counts related to Plaintiff being disciplined and criminally charged for narcotics-related offenses following his July 12, 2019 overdose.  The Complaint seeks the following relief:

> A. preliminary and permanent injunction requiring removal of Plaintiff from disciplinary segregation and a reclassification to Medium Security;

> B. A preliminary and permanent injunction prohibiting Defendants from further retaliation against Plaintiff;

> C. An award of compensatory, punitive, and nominal damages;

> D. An award of costs and attorneys' fees arising out of this litigation; and

> E. Any other relief this Court deems appropriate.

ECF 38, p.21.

The Complaint is chiefly premised on Plaintiff's assertion that the disciplinary charges were brought against him as retaliation for not cooperating in the investigation into his overdose, and that the criminal prosecution against him was initiated in retaliation for this lawsuit.  Plaintiff's Complaint alleged he "had no involvement" in bringing the narcotics on which he overdosed into the ACI, and that he heard about the narcotics "for the first time when he was offered it."  ECF 38 ¶ 25.  He contended he was disciplined "without proof and contrary to facts."  ECF 38 ¶ 29.  The Plaintiff additionally alleged that other Defendants "authorized or condoned the unlawful retaliation" and failed to properly supervise Investigators Bibeault and Cabral.  ECF 38 ¶¶ 12-14.  The Complaint also alleges under the Eighth Amendment that "[a]ll Defendants violated Mr. Cintron's right to be free from cruel and unusual punishment by deliberately and recklessly placing him at substantial risk of serious harm."  ECF 38 ¶ 99.

Pursuant to this Court's scheduling order, the parties have been engaged in discovery. Defendants have produced over 2,000 pages of documents to Plaintiff in response to discovery requests and the parties were conferring regarding Plaintiff's requests for additional documents. On January 14, 2022, Plaintiff served 43 interrogatories on Defendants. *See* ECF 44-3. Many of the interrogatories sought information that was also directly related to the ongoing criminal prosecution of Plaintiff for conveying narcotics. On January 18, 2022, Plaintiff sent Defendants seven notices of party depositions, in addition to three non-party subpoenas. Among others, Plaintiff sought to depose Investigators Bibeault and Cabral, as well as non-party Rhode Island State Police Corporal Tilson, the three of whom were likely to be the chief witnesses against Plaintiff in the state court criminal prosecution.

Due the to the nature of Plaintiff's civil claims, combined with Plaintiff's extensive discovery requests seeking discovery that was also directly related to the criminal prosecution, on February 1, 2022, Defendants filed a Motion to Stay the civil case pending resolution of the criminal prosecution. *See* ECF 44. Citing precedent, including the similar case of *Boudreau v. Petit*, 1:17-cv-0301-WES, Defendants argued that proceeding with this civil lawsuit would put this Court in a position to potentially issue a ruling that could create direct tension with, and undermine, the state criminal prosecution. Plaintiff filed an objection to the stay. *See* ECF 47. In arguing against a stay, Plaintiff clarified the nature of his civil claims beyond the information provided in the Complaint. As the Complaint itself largely described the claims in very generic, conclusory terms, this more-recent filing from Plaintiff provided some additional understanding regarding the nature and basis of the claims alleged. The Motion to Stay was referred to Magistrate Judge Sullivan and a hearing was scheduled for March 18, 2022.

Prior to the scheduled hearing, Defendants notified the Court that the Plaintiff had been scheduled to appear before the Rhode Island Superior Court in the criminal case, P2-2021-0683A, on March 31, 2022.  On that basis, the hearing on the Motion to Stay was continued to April 27, 2022.  On March 31, 2022, Plaintiff pleaded guilty in Rhode Island Superior Court to Counts 1 and 2 of P2-2021-0683A (conveying an unauthorized article (Fentanyl) into the ACI, and conspiracy to convey an unauthorized article to or from the ACI).  *See* Exhibits C (Judgment of Conviction) and D (Transcript of Plea).  As part of the plea, the Plaintiff specifically admitted that the State could prove that he, along with co-conspirators Rafael Ferrer, Devante Neves, and Destiny Valley, arranged for Destiny Valley to be driven to the ACI to deliver illegal narcotics to then-inmate Neves and that, consistent with their agreement, on July 10, 2019, Destiny Valley was driven to the ACI, met with Neves during visiting hours, and provided him with a bag of fentanyl. *See* Exhibit D, p.9-11.  For each count, Plaintiff was concurrently sentenced to five years, with one year to serve and four years probation, and was given credit for time held from October 13, 2020 to present.  *See* Exhibit C.  Plaintiff's plea resolved the criminal case against Plaintiff.  As a result of the plea, Plaintiff was also found to be a violator in connection with P2-2016-1525A and P2-2013-2153AG and was continued in those cases on the same sentence.  *See* Exhibit D, p.11.

Defendants then filed and the Court granted an assented to Motion to Stay to permit Defendants to file this instant Motion for Judgment on the Pleadings in light of the latest developments.  The length of this Motion is a product of the need to address the multiple arguments that apply to Plaintiff's various different claims, all of which Plaintiff has persisted in pressing despite admitting guilt in the related criminal proceedings.

## **LEGAL STANDARD**

"A motion for judgment on the pleadings is appropriate when it is clear from the pleadings that the movant should prevail." *Am. States Ins. Co. v. LaFlam*, 808 F. Supp. 2d 400, 402–03 (D.R.I. 2011) (quoting *Burns v. Conley*, 526 F.Supp.2d 235, 241 (D.R.I.2007)). "The Court considers a motion for judgment on the pleadings under Rule 12(c) according to the same standard by which it decides a Rule 12(b)(6) motion." *Id.*

"The Court may base its decision on 'documents the authenticity of which are not disputed by the parties; documents central to plaintiff['s] claim; and documents sufficiently referred to in the complaint.'" *Id.* (quoting *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir.2007)).  To the extent documents are referenced in this Motion, those documents consist of official court records from the criminal proceedings and documents the authenticity of which are not disputed and can properly be considered in the context of this Motion for Judgment on the Pleadings.  *See Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009) (recognizing exception allowing "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint" to be considered without converting a Rule 12 Motion into a motion for summary judgment, and determining that a complaint and a judgment from the Massachusetts Superior Court "fit squarely within this exception").  These criminal proceedings were also referenced in the Complaint.  *See* ECF 38 ¶¶ 94, 95 (referencing criminal cases, including the violation report attached hereto as Exhibit E.  The documents from the criminal proceedings attached as exhibits to this Motion are intended to provide background regarding the nature and disposition of the related criminal matters, as the resolution of the criminal matters is a matter of court record and is relevant to this motion. If this Court determines that any of the attached documents are material to

this Motion and do not meet the standard for being considered in the context of a Rule 12 motion, this Motion may be converted into one for summary judgment.  *See Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000) ("when the opponent has received the affidavit and materials, has had an opportunity to respond to them, and has not controverted their accuracy" there is no harm to converting motion into one for summary judgment).

## ARGUMENT

Defendants are entitled to judgment on the pleadings on each of Plaintiff's seven claims for a variety of reasons that will be addressed in turn.  Additionally, none of the relief Plaintiff seeks in this action is viable.

### A.  **Count 7: First Amendment (Retaliatory Prosecution)**

Count 7 of Plaintiff's Complaint pleads that "Defendant Bibeault violated Plaintiff's right to petition the courts for redress of grievances by initiating criminal charges against Plaintiff in retaliation for advancing litigation against him."  ECF 38 ¶ 123.  The body of the Complaint generally references two criminal matters involving Plaintiff: the filing of a state District Court criminal case against Plaintiff on October 7, 2020 (which later became Superior Court case P2-2021-0683A), and "the 32(f) Violation Report filed by the Attorney General in P2/16-1525A, *State of Rhode Island v. Cintron*," which was also initiated against Plaintiff on October 7, 2020 in connection with Plaintiff's prior criminal cases, P2-2016-1525A and P2-2013-2153AG.  ECF 38 ¶¶ 94, 95.  The 32(f) violation report asserted that "Defendant did fail to comply with a specific condition of probation in that he/she failed to keep the peace and be of good behavior."  Exhibit E, p.1.  Attached to the violation report was a police incident report describing the investigative findings related to the July 10, 2019 narcotics conveyance and conspiracy involving Plaintiff, Neves, Valley, and Ferrer, which was also the subject of P2-2021-0683A.  *See* Exhibit E.  As such,

Count 7 apparently alleges that Defendant Bibeault initiated criminal charges against Plaintiff in P2-2021-0683A and/or the Rule 32(f) violation action in retaliation for filing this lawsuit.

To succeed on a First Amendment retaliation claim, Plaintiff must demonstrate that: "(1) he engaged in constitutionally protected conduct, (2) he suffered an adverse action, and (3) there was a causal connection between the constitutionally protected conduct and the adverse action, so that it can be said that the constitutionally protected conduct was a motivating factor for the adverse action." *Price v. Wall*, 464 F. Supp. 2d 90, 96 (D.R.I. 2006). The Plaintiff "must demonstrate that the retaliatory act would not have occurred 'but for' the protected conduct." *Id.* (citing *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir.1979)). "Furthermore, even if the defendant had an impermissible reason for the alleged adverse action, if a separate, permissible reasons exists, the defendant will not be liable." *Id.* Significantly, lack of probable cause is an essential element that must be pleaded and proved as part of a claim of retaliatory inducement to criminal prosecution under the First Amendment. *See Hartman v. Moore*, 547 U.S. 250, 262-66 (2006). There is no dispute in this regard as Plaintiff has acknowledged that "[t]he Supreme Court in *Hartman* established that lack of probable cause was a necessary element of an action under the First Amendment for retaliatory prosecution or retaliatory inducement to prosecute based on speech." ECF 47, p.9.

Plaintiff's Complaint did not plead that there was a lack of probable cause for the Rule 32(f) violation report or criminal charges against him. At most, Plaintiff alleged that the investigation into him first occurred in July and August 2019 and that there was then a pause in the investigation until September 2020. *See* ECF 38 ¶¶ 95, 96. Plaintiff seems to intimate that there was a connection between his filing of his first amended complaint in July 2020 and a resumption of the investigation into him roughly two months later in September 2020. But Plaintiff does not plead any *facts* demonstrating, or even inferring, that Investigator Bibeault took

investigative actions in September 2020 *because* of this lawsuit, especially when Plaintiff engaged in the asserted protected conduct ("advancing litigation against" Defendant Bibeault, ECF 38 ¶ 123) in September 2019, which was an entire year earlier.  *See* ECF 1.

More importantly, Count 7 did not allege that Investigator Bibeault's investigation was itself the "adverse action" that is the basis for this count; rather Count 7 is premised on the initiation of criminal charges against Plaintiff.  *See* ECF 38 ¶ 123; *see also Hartman*, 547 U.S. at 262 n.9 (noting that Court has not determined whether conducting a retaliatory investigation with a view to promote a prosecution could even constitute a constitutional tort).  But Plaintiff does not plead any facts regarding what role, if any, the only defendant named in this count, Investigator Bibeault, had in connection with the decision of the Office of Attorney General to initiate criminal charges or violation proceedings against Plaintiff.  *See Hartman*, 547 U.S. at 262 n.9 ("a plaintiff . . . must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging").  Similarly, Plaintiff does not plead any facts to indicate any causal connection between the filing of this civil lawsuit against Defendant Bibeault in September 2019 and the initiation of a violation report/criminal charges against Plaintiff by the Office of Attorney General in October 2020.  On its face, the Complaint fails to state a First Amendment retaliatory prosecution claim.

The failure of Count 7 is accented and confirmed by recent developments.  The Rhode Island Superior Court expressly found that there was probable cause for criminal charges against Plaintiff, which were based on the same basic underlying facts as the violation report.  Regarding Counts I and II of the Criminal Information, which pertained to conveying narcotics into the ACI on or about July 10, 2019, the Superior Court held that "a review of the information package, as discussed at the outset of this decision, in the light most favorable to the State makes it clear that

probable cause exists as to Counts 1 and 2 in this case." Exhibit B, p.23-25.[5] Moreover, Plaintiff has now pleaded guilty[6] to conveying and conspiring to convey narcotics into the ACI. During the plea colloquy, the prosecutor recited how Plaintiff conspired with other individuals to have fentanyl conveyed into the ACI on or about July 10, 2019. In response, Plaintiff expressly agreed that "those facts [are] true" and admitted that "the State could prove those facts at trial with evidence and by proof beyond a reasonable doubt." Exhibit D, p.10. As such, Plaintiff has admitted that the criminal case against him was not only supported by probable cause, but that the factual allegations against him regarding conveying narcotics and conspiring to convey narcotics into the ACI are true. As a result of Plaintiff's plea, he was also determined to be a probation violator in connection with the violation report and his prior criminal cases. *See* Exhibit D, p.11. As it is now established as a matter of law that there was probable cause for the alleged "adverse action" against him and that Plaintiff did in fact commit crimes that were the subject of the criminal case and violate his probation, that is dispositive of Count 7. *See Hartman*, 547 U.S. at 262-66.

## B.  <u>Count 6: Abuse of Process (State Tort Claim)</u>

Regarding Count 6, Plaintiff pleads, "Defendant Bibeault abused the state criminal justice process by initiating criminal legal proceedings against Plaintiff in retaliation for advancing litigation against him. The initiation of criminal charges was an ulterior or wrongful use of the criminal process." ECF 38, ¶ 120. This state law claim is based on the same attenuated arguments

---

[5] The Rhode Island Superior Court dismissed Counts III and IV not based on the defense counsel's argument that there was a lack of probable cause for those counts, but because the Court believed the evidence against Mr. Cintron related to those counts implicated Rhode Island's Good Samaritan Act.

[6] Plaintiff pleaded nolo contendere but it is well-established under Rhode Island law, and was specifically explained to Plaintiff during the plea disposition, that a nolo contendere plea is the equivalent of a guilty plea in Rhode Island. *See State v. Feng*, 421 A.2d 1258, 1266 (R.I. 1980) ("In Rhode Island a nolo plea is equivalent to a plea of guilty."); Exhibit D, p3.

about the criminal charges/Rule 32(f) violation proceedings and the timeline of Investigator Bibeault's investigation that are discussed above with regard to Count 7.

"[T]he torts of malicious prosecution and abuse of process are 'not favored in the law.'" *Hillside Associates v. Stravato*, 642 A.2d 664 (1994) (quoting The American Law of Torts § 28:3 at 10).  Two elements are required under Rhode Island law to demonstrate abuse of process: "(1) the defendant instituted proceedings or process against the plaintiff and (2) the defendant used these proceedings for an ulterior or wrongful purpose that the proceedings were not designed to accomplish." *Vigeant v. United States*, 462 F. Supp. 2d 221, 231 (D.R.I. 2006), aff'd, 245 F. App'x 23 (1st Cir. 2007).  Under this second element, the Rhode Island Supreme Court has noted that the improper purpose typically is extortionary, "tak[ing] the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Butera v. Boucher*, 798 A.2d 340, 353 (R.I. 2002) (quoting W. Page Keeton, Prosser & Keeton on the Law of Torts § 121 at 898 (5th ed. 1984)).

Count 6 suffers a number of the same defects as Count 7.  With regard to the first element of the claim, Defendant Bibeault did not "institute[]" process against the Plaintiff.  The violation report and criminal case against Plaintiff were filed by the Office of Attorney General.  The Plaintiff has not pleaded any facts indicating that Defendant Bibeault, who is the only defendant named in this count, caused the initiation of the criminal charges and/or violation report by the Attorney General.  There is not even a suggestion in the pleading that Investigator Bibeault had any communications at all with the prosecuting entity.  Although a retaliatory motive is not an element of an abuse of process claim, Plaintiff has also failed to plead any facts to support his conclusory assertion that the initiation of process was based on a retaliatory motive.  At most, he

14

pleads that Defendant Bibeault paused and then recommenced his investigation a couple of months after an amended complaint was filed in this lawsuit. Plaintiff does not identify any way in which the amended complaint against Investigator Bibeault was materially different from the complaint Plaintiff filed against Defendant Bibeault in September 2019 initiating this lawsuit. Plaintiff does not plead any facts to suggest or even infer a causal link between the protected conduct, i.e, Plaintiff "advancing litigation against" Defendant Bibeault, which commenced in September 2019, ECF 38, ¶ 120, and the progress of the investigation or the initiation of criminal proceedings a year later in September and October 2020. In sum, Plaintiff does not plead any facts suggesting that the initiation of criminal legal proceedings against him in October 2020 was linked to this 2019 lawsuit or based on anything other than the evidence.

Additionally, even assuming arguendo that Plaintiff satisfied the first element of an abuse of process claim, Plaintiff does not plead any facts to support the second element of the claim, namely that the criminal proceedings were used "for an ulterior or wrongful purpose *that the proceedings were not designed to accomplish*." *Vigeant*, 462 F. Supp. 2d at 231 (emphasis added). The Rhode Island Federal District Court applied this second element of abuse of process in *Vigeant v. United States*, which involved a claim that initiation of process against a prisoner was carried out with an ulterior motive. 462 F. Supp. 2d at 231. The *Vigeant* Court noted that "[u]nder Rhode Island law, '[t]he gist of an abuse-of-process claim is the misuse of legal process *to obtain an advantage, 'not properly involved in the proceeding itself....'* [However], *even a pure spite motive is not sufficient where process is used only to accomplish the result for which it was created*.'" *Id.* (emphasis added). In that case, the Court concluded that "Agent Burns's alleged remarks show, if anything, only a colorable malevolence toward Vigeant and not, as required, the *perversion* of process to obtain some collateral advantage." *Id.* (emphasis in original); *see also Bolduc v. United*

*States*, No. CIV.A.01-CV-11376PBS, 2002 WL 1760882, at *4 (D. Mass. July 30, 2002) (cited approvingly in *Vigeant*) ("there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.").

Here, Plaintiff alleges that the process against him was initiated out of a retaliatory motive, ECF 38 ¶ 120, but under Rhode Island law, it does not matter if Defendant's motive for initiating process against the Plaintiff was spite or anything else as long as the process was not used for anything other than for that which it is intended. Even if the Defendant intended, out of spite, for Plaintiff to be put through violation proceedings and for the proceedings to result in Plaintiff being found to be a probation violator, that is the designed end of a violation action. Similarly, if the Defendant intended for Plaintiff to be put through a criminal prosecution and for it to result in Plaintiff's conviction and punishment, conviction and punishment are the intended end of a criminal prosecution. Plaintiff has not pleaded any facts suggesting that the process at issue here was utilized in order to coerce some other, collateral result as required under Rhode Island law.

The United States Supreme Court has likewise recognized that "extortionate perversion" is a necessary element of an abuse of process claim and that "[c]ognizable injury for abuse of process is limited to the harm caused by the misuse of process, and does not include harm (such as conviction and confinement) resulting from that process's being carried through to its lawful conclusion. Thus, one could no more seek compensatory damages for an outstanding criminal conviction in an action for abuse of process than in one for malicious prosecution." *Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994) (noting that expenses incurred by the plaintiff in defending herself against crimes charged against her were not compensable in a suit for abuse of process). As such, abuse of process does not concern itself with any harm Plaintiff experienced as a result of the criminal process against him being carried through to its lawful end and his ultimate

16

conviction and/or probation violation.   Plaintiff has not pleaded any compensable injury he

experienced related to abuse of process and Defendants are entitled to judgment on this count.[7]

C. **Count 4 and 5: Intentional Infliction of Emotional Distress and Negligent Supervision (State Tort Claims)**

1. Count 4: Intentional Infliction of Emotional Distress

Under Count 4, Plaintiff pleads that "Defendants Bibeault and Cabral intended to, and did,

cause Mr. Cintron severe emotional distress in retaliation for not cooperating with their

investigation." ECF 38 ¶ 111.  Plaintiff's Complaint does not identify the specific alleged conduct

by Defendants that is the basis for this claim.   In responding to Defendants' Motion to Stay,

Plaintiff asserted that the "'adverse action' in this case was the *issuance of a [disciplinary]*

*booking*[, i.e.] a prehearing action, as opposed to a disciplinary hearing, conviction, or sanction.

*Plaintiff did not and does not challenge in this proceeding the validity of the guilty verdict or*

*sanction resulting from the booking*[.]"   ECF 47, p.7 (emphasis added).[8]   In that same brief,

Plaintiff characterized his intentional infliction of emotional distress claim by stating, "Defendants

Bibeault and Cabral threatened to 'bury [Plaintiff] in seg' and cause him lasting harm if he did not

cooperate with their investigation into alleged narcotics trafficking." *Id.*, p.8.  This seems to derive

from Plaintiff's allegation in his Complaint that "Defendant Bibeault told Mr. Cintron that he

would write him a booking for trafficking. When Mr. Cintron asked why, Bibeault replied that it

---

[7] Defendants' Motion for Judgment on the Pleadings seeks judgment on each count of Plaintiff's Complaint. If this Motion resolves Plaintiff's federal claims, that presents yet another ground for dismissal of the state law tort claims.  *See Penate v. Hanchett*, 944 F.3d 358, 369–70 (1st Cir. 2019) ("When all federal-law claims are eliminated before trial, usually the balance of factors [from *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)] will point toward declining to exercise jurisdiction over the remaining state-law claims.") (internal quotations omitted).

[8] These comments were made in the context of discussing Counts 2 and 3, but Plaintiff's brief unequivocally stated that "Plaintiff did not and does not challenge *in this proceeding* the validity of the guilty verdict or sanction resulting from the booking[.]"  ECF 47, p.7 (emphasis added).

was because Mr. Cintron was 'being a hard-ass.'" ECF 38 ¶ 42. As such, Defendants understand the basis for Plaintiff's intentional infliction of emotional distress claim to be Plaintiff's allegation that Defendants Bibeault and Cabral threatened to issue him a disciplinary booking for conveying narcotics. As noted above, Plaintiff has made very clear that this lawsuit does not pertain to the disciplinary sanction he received resulting from the booking. *See* ECF 47, p.7 ("Plaintiff did not and does not challenge in this proceeding the validity of the guilty verdict or sanction resulting from the booking.").

Under Rhode Island law, "[t]o prove intentional infliction of emotional distress, the plaintiff must allege and prove that the defendant intentionally or recklessly engaged in extreme and outrageous conduct, resulting in the plaintiff's severe emotional distress." *Wright v. Zielinski*, 824 A.2d 494, 499 (R.I. 2003) (citing *Jalowy v. Friendly Home, Inc*., 818 A.2d 698, 707 (R.I.2003)); *Vallinoto v. DiSandro*, 688 A.2d 830, 838 (R.I.1997)).

To establish this claim, the plaintiff must show "extreme and outrageous conduct on the part of the defendant." *Jalowy.,* 818 A.2d at 707. The Rhode Island Supreme Court has adopted "the very high standard set forth in the Restatement (Second) Torts § 46 (1965) with regard to what evidence is required to satisfy this element of the claim":

> "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community*. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Swerdlick*, 721 A.2d at 863 (quoting Restatement (Second) Torts, § 46 cmt. d at 73).

*Jalowy,* 818 A.2d at 707 (emphasis in original).

Here, Plaintiff alleges that the "wrongful conduct" at issue is Defendants Bibeault and Cabral threatening to issue Plaintiff a booking for trafficking narcotics, which is conduct that Plaintiff has now admitted before the Rhode Island Superior Court that he engaged in.  The Rhode Island Supreme Court has been very clear regarding the "the very high standard" that must be met to satisfy the "extreme and outrageous" element of this claim, which can only exist "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Jalowy.,* 818 A.2d at 707.  Acting with an intent that is tortious or even criminal will not suffice.  *See id*.  Defendants allegedly informing Plaintiff they would pursue a disciplinary booking against him for conduct Plaintiff did in fact do simply cannot rise to that standard.

The Rhode Island Supreme Court has also held that "a party may not be liable for intentional infliction of emotional distress 'when [a defendant] has done no more than insist on [its] legal rights in a permissible way, even though such insistence is likely or even certain to annoy, disturb, or inconvenience [plaintiff] or even cause [plaintiff] to suffer some emotional distress." *Jalowy.,* 818 A.2d at 709-10 (quoting *Swerdlick v. Koch*, 721 A.2d 849, 863 (R.I.1998)). The investigator defendants have a legal right, and indeed a professional responsibility, to investigate disciplinary infractions and to issue bookings to inmates who violate prison rules. Defendants Bibeault and Cabral informing Plaintiff that he could be booked for trafficking narcotics, which Plaintiff admits he did, constitutes no more than Defendants doing their job, even if it is likely to disturb Plaintiff or cause him to experience distress.  Additionally, Plaintiff did not suggest that Defendants Bibeault or Cabral had control over whether Plaintiff would be found guilty or the ultimate sanction Plaintiff would receive.

In addition, under Rhode Island law for intentional infliction of emotional distress, the Plaintiff "is required to allege and prove 'physical symptomatology resulting from the alleged improper conduct.'" *Lisnoff v. Stein*, 925 F. Supp. 2d 233, 241 (D.R.I. 2013) (quoting *Vallinoto v. DiSandro*, 688 A.2d 838 (R.I. 1997)). Plaintiff's Amended Complaint pleads in connection with Count 4 that he experienced "loss of sleep, weight, and hair, and injuries to his hand." ECF 38 ¶ 112. However, the Amended Complaint pleads that those effects occurred not as a result of Plaintiff being told by Defendants that they would book him, but because of him actually being sentenced to disciplinary confinement. *See* ECF 38 ¶¶ 66, 67 (pleading he experienced these negative impacts "[a]fter his placement in disciplinary confinement" and as a result of the conditions therein). In his Opposition to Defendants' Motion to Stay, Plaintiff emphasized that this lawsuit does not take issue with his disciplinary conviction or sanction. *See* ECF 47, p.7. And indeed, Plaintiff does not allege that the Defendants named in Count 4, Bibeault and Cabral, had anything to do with determining Plaintiff's guilt at the disciplinary proceedings or sentencing him to disciplinary confinement. Plaintiff does not factually plead any physical symptomatology that resulted from the conduct that is the basis for his intentional infliction of emotion distress claim, namely, Defendants Bibeault and Cabral allegedly threatening to proceed with issuing him a disciplinary booking. As such, Plaintiff failed to allege or plead any facts supporting the "physical symptomatology" requirement of an intentional infliction of emotional distress claim. For all these reasons, Defendants are entitled to judgment on Count 4.

2. Count 5: Negligent Supervision

Plaintiff has explained that his negligent supervision claim, Count 5, is "attached to" his intentional infliction of emotional distress claim, and as such, that claim must also fail. *See* ECF 47, p.9. The negligent supervision claim, which is brought under state law, is based on the premise

that Defendants Coyne-Fague and Kettle "are liable for the harm resulting from Bibeault and Cabral's tortious acts." ECF 38 ¶ 117. Accordingly, Count 5 is premised on Defendants Bibeault and Cabral having committed "tortious acts" as alleged in Count 4. Because the Count 4 intentional infliction of emotional distress claim fails as a matter of law, that is also dispositive of Count 5.

Additionally, as noted above, Plaintiff did not plead any injury or compensable harm that resulted from the alleged conduct that is the subject of Counts 4 and 5. Moreover, Plaintiff failed to plead any *facts* indicating that Defendants Coyne-Fague or Kettle had knowledge of the conduct by Defendants Bibeault and Cabral that Plaintiff alleges was tortious, or that they failed to carry out any supervisory duties they had. *See Rivers v. Poisson*, 761 A.2d 232, 235 (R.I. 2000) (negligent supervision claim failed where employers were not made aware of the conduct at issue until afterward); *Broadley v. State*, 939 A.2d 1016, 1022 (R.I. 2008) ("the trial justice correctly concluded that plaintiffs failed to prove that [the employee] was known to exhibit aggressive behavior toward patients or that any supervisors failed to properly monitor his job performance; therefore, the allegation properly was dismissed"); *Rodrigues v. Miriam Hosp.*, 623 A.2d 456, 464 (R.I. 1993) (negligence claim against employer failed where there were no relevant complaints against employee and employer did not have reason to know of alleged issue with employee).

Plaintiff pleads in conclusory fashion that Defendants Coyne-Fague and Kettle "either knew or should have known about the allegations of misconduct against Defendants Bibeault and Cabral," and thus "are liable for the harm resulting from Bibeault and Cabral's tortious acts." ECF 38 ¶¶ 116, 117. But Plaintiff does not allege that he or anyone else ever informed either of these Defendants about any concerns regarding Investigators Cabral and Bibeault prior to when Investigators Bibeault and Cabral allegedly committed the "tortious" conduct. He does not plead

any facts that could be a basis for finding these Defendants liable.  Plaintiff alleges that Defendants Kettle and Coyne-Fague "knew or should have known about the allegations of misconduct against Defendants Bibeault and Cabral, and failed to take sufficient action, such as conducting an investigation or initiating internal disciplinary proceedings, or training the employees," ECF 38 ¶ 116, but those allegations only pertain to what Plaintiff thinks should have happened *after* the alleged tortious conduct occurred, it does not allege that the "tortious" conduct occurred because of any negligence on the part of Defendants Kettle or Coyne-Fague.  Moreover, Plaintiff does not even allege that he or anyone else informed these Defendants about the alleged tortious conduct, i.e., Investigators Bibeault and Cabral threatening to issue him a disciplinary booking, anytime prior to filing this lawsuit.

Plaintiff's conclusory pleading against Defendants Coyne-Fague and Kettle offers nothing more "than an unadorned, the-defendant-unlawfully-harmed-me accusation" that fails to state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007))).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (internal citations omitted); *see also id.* at 680-81 (rejecting allegations baldly alleging that "petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as matter of policy'" and that Ashcroft was the "principal architect" of this invidious policy, and that Mueller was "instrumental" in adopting and executing it).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* (citing Twombly, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing Twombly, 550 U.S. at 556). The Court's application of the Rule 8 pleading standard "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79.  Such is the case here. Defendants are entitled to judgment on Counts 4 and 5.

### D. <u>Counts 2 and 3: First and Fifth Amendment Claims</u>

Counts 2 and 3 derive from Plaintiff's contention that Defendants Bibeault, Cabral, and Diniz initiated or condoned disciplinary proceedings against him in retaliation for exercising constitutionally-protected conduct, namely refusing to provide information to investigators in connection with their investigation into his overdose.  *See* ECF 38 ¶¶ 103, 106.  As noted above, in opposing Defendants' Motion to Stay, Plaintiff clarified that the "adverse action" that is the basis for his First and Fifth Amendment claims is *not* being disciplined and subjected to disciplinary confinement, but only to being issued a booking.  *See* ECF 47, p.7 ("The 'adverse action' in this case was the 'issuance of a [disciplinary] booking [,i.e.] a prehearing action,' ECF 38, ¶ 104, as opposed to a disciplinary hearing, conviction, or sanction.").  However, Plaintiff does not plead any compensable harm that he experienced simply from receiving a booking (but not the related discipline or sanction, which Plaintiff expressly represents is not part of these claims).

Plaintiff's claims do not comply with the Prison Litigation Reform Act ("PLRA").[9] Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act[.]" 42 U.S.C. § 1997e(e).  To sustain a claim, Plaintiff was required to allege a physical injury.  *See Mitchell v.*

---

[9] The arguments based on the PLRA also apply to Plaintiff's other claims.

*Horn,* 318 F.3d 523, 533 (3d Cir. 2003); *Herman v. Holiday,* 238 F.3d 660, 665 (5th Cir. 2001); *Tribe v. Snipes,* 19 Fed. Appx. 325, 326 (6th Cir. 2001); *Cassidy v. Indiana Dept. of Corrections,* 199 F.3d 374, 376–77 (7th Cir. 2000); *Oliver v. Keller,* 289 F.3d 623, 627 (9th Cir. 2002); *Milledge v. McCall,* 43 Fed. Appx. 196, 197 (10th Cir. 2002); and *Harris v. Garner,* 216 F.3d 970 (11th Cir. 2000).   The First Circuit has expressly referenced the PLRA's "physical injury requirement for recovering damages."  *Ford v. Bender,* 768 F.3d 15, 22 (1st Cir. 2014) (finding it unnecessary to analyze argument that physical injury requirement was not satisfied because case could be resolved on other grounds).  Because Plaintiff did not identify any physical injury related to these claims, they must be dismissed.  At most, Plaintiff's Complaint pleads that he experienced physical effects from being sentenced to disciplinary confinement, but Plaintiff made clear that it was the issuance of a booking, not the disciplinary conviction or sentence, that is the basis for his First and Fifth Amendment retaliation claims.

The PLRA also requires that prisoners exhaust administrative remedies prior to bringing an action under federal law: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997(e).  The Supreme Court has held that dismissal is mandatory when a plaintiff has failed to exhaust administrative remedies:

> "[E]xhaustion in cases covered by § 1997e(a) is now mandatory.  All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'  Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.  And . . . exhaustion is now required for all 'action[s] ... brought with respect to prison conditions,' whether under § 1983 or 'any other Federal law.'"

*Porter v. Nussle*, 534 U.S. 516, 524 (2002); *LeBlanc v. Rhode Island*, No. CA 11-101 M, 2011 WL 7099502, at *7 (D.R.I. Dec. 21, 2011), report and recommendation adopted sub nom. *LeBlanc v. Wall*, No. CA 11-101-M, 2012 WL 244383 (D.R.I. Jan. 25, 2012).  "The statute's requirements are clear: If administrative remedies are available, the prisoner must exhaust them" and courts are not free "to engraft upon the statute an exception that Congress did not place there." *Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000) (dismissing complaint for failure to exhaust remedies). Here, Plaintiff has not alleged that he exhausted administrative remedies or filed any grievances related to the alleged conduct by Defendants Bibeault, Cabral, and Diniz that is the subject of Counts 2 and 3.

Additionally, although this claim is based on Plaintiff being issued disciplinary bookings, Plaintiff does not plead that Defendants Cabral or Diniz issued Plaintiff any bookings.[10]  It is not clear from the pleading how Defendants Cabral and Diniz are implicated in Counts 2 and 3 at all as Plaintiff fails to plead any facts regarding these Defendants participating in issuing any allegedly retaliatory bookings. *See infra* p.36-37 (citing caselaw regarding how liability cannot be premised on supervisory position alone).  Plaintiff's assertion that Defendant Cabral "willfully and knowingly participated in unlawful and retaliatory disciplinary proceedings against Mr. Cintron" is entirely conclusory. *See* ECF 38 ¶ 11.  At most, Plaintiff pleads that Defendant Diniz told him that "he would personally make sure that he got 365 days in disciplinary segregation—the maximum sanction for narcotics trafficking." ECF 38 ¶ 43.  Even assuming for the moment that this allegation is true, it does not support Plaintiff's claims in Counts 2 and 3, especially given that Plaintiff expressly represented that Counts 2 and 3 only pertain to the booking he received and

---

[10] Plaintiff alleges that Defendant Bibeault issued three of the bookings referenced in the Complaint, but not the first booking for being under the influence of unauthorized drugs. *See* ECF 38 ¶ 27.

disclaimed that the actual sanction he received forms the basis for these First and Fifth Amendment claims.  Plaintiff also pleads that "Mr. Cintron requested that Defendant Diniz, in his capacity as Warden of Medium Security, suspend the remainder of his disciplinary time. Warden Diniz refused." ECF 38 ¶ 84.  Again, that allegation, which pertains to the disciplinary sanction, has no bearing on Counts 2 and 3, which Plaintiff explained pertain to the booking itself and do not pertain to the "disciplinary hearing, conviction, or sanction." ECF 47, p.7.

Significantly, Plaintiff has now admitted to the core conduct for which he was booked. Plaintiff has never disputed that he possessed and was under the influence of an illicit and illegal substance that led to his overdose.  ECF 38 ¶ 18 ("On July 12, 2019, while incarcerated in the Medium Security facility, Mr. Cintron was offered, and ingested, half a pill of what he was told was Percocet. The substance turned out to be laced with fentanyl.").  Nor has he disputed that he circumvented telephone procedures.  Plaintiff has also now expressly pleaded guilty to conspiring to convey and conveying narcotics into the ACI.

A claim asserting retaliation for the exercise of a constitutional right consists of three elements: (1) the plaintiff engaged in constitutionally protected conduct; (2) the plaintiff suffered an adverse action that would deter a person of ordinary firmness from the exercise of the right at stake; and (3) there was a causal connection between the constitutionally protected conduct and the adverse action. *Moore v. Begones*, No. CIV.A. 09-543 S, 2010 WL 27482, at *5 (D.R.I. Jan. 4, 2010) (adopting report and recommendation) (citing *Thaddeus–X v. Blatter*, 175 F.3d 378, 393 (6th Cir.1999) (en banc)).  "[D]efendants may avoid liability by showing that they would have taken the same action even in the absence of the prisoner's protected conduct." *Id.* (citing *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir.1979) for the proposition that plaintiff must demonstrate that retaliatory act would not have occurred "but for" protected conduct).  "[E]ven if

the defendant had an impermissible reason for the alleged adverse action, if a separate, permissible reason exists, the defendant will not be liable." *Id.* at *5-6 (dismissing complaint where pleadings also alleged facts showing that correctional officer had a permissible reason for imposing segregation).

In a similar context, the Rhode Island Federal District Court has repeatedly recognized that claims based on false bookings fail when there is a permissible reason for imposing discipline. *See Benbow v. Weeden*, No. CA 13-334 ML, 2013 WL 4008698, at *6 (D.R.I. Aug. 5, 2013) (noting how plaintiff's claim was defective not only for failing to allege a retaliatory motive, but also because the plaintiff did not contest the gravamen of the charges against him in the booking); *see also Petaway v. Duarte*, No. CA 11-497-ML, 2012 WL 1883506, at *3 (D.R.I. May 22, 2012) (report not fabricated where plaintiff did not dispute that he was involved in altercation, even if he characterized it differently than the defendant).

Here, Plaintiff admits in his Complaint that he ingested narcotics, and before the Rhode Island Superior Court admitted that he in fact participated in conveying and conspiring to convey narcotics in to the ACI. As such, there was clearly a permissible reason for the bookings Plaintiff received, which summarily defeats Plaintiff's claims. In these circumstances, where Plaintiff was issued bookings for conduct he in fact did, Plaintiff has also failed to plead any facts that would warrant waiving these Defendants' qualified immunity. *See infra* p.35-36 (discussing qualified immunity).

The brashness of Plaintiff's course of conduct in this case is stunning. Plaintiff admittedly participated in conveying the potentially lethal drug fentanyl into a secure prison facility. He then overdosed on fentanyl and was saved by Department of Corrections personnel who rushed him to the hospital, and he was administered multiple doses of Narcan. Plaintiff then refused to cooperate

with Defendants' efforts to determine how the substance that could have killed him, and could kill other inmates, entered the ACI.   He then sued those same Defendants for booking him for possessing and conveying fentanyl, while claiming he had no idea how the drug he ingested entered the facility.   Despite now admitting that it was true that he took fentanyl and engaged in an organized effort to bring fentanyl into the ACI, Plaintiff persists in casting the blame on Defendants and arguing that he was issued disciplinary bookings simply out of retaliation.   Plaintiff's allegations are frivolous and an affront to Defendants' efforts to protect the inmate population and keep dangerous drugs from entering the facility.

### E.  **Count 1: Eighth Amendment Claim**

#### 1.  Plaintiff Fails to State a Claim

Plaintiff's Eighth Amendment claim pleads in the most general of terms that "[a]ll Defendants violated Mr. Cintron's right to be free from cruel and unusual punishment by deliberately and recklessly placing him at substantial risk of serious harm."   ECF 38 ¶ 99.   In opposing Defendants' Motion to Stay, Plaintiff clarified that "[t]his claim does not implicate the validity of any underlying conviction, sanction or justification for his restrictive housing."   ECF 47, p.6.   Also, in opposing Defendants' Motion to Stay, Plaintiff further clarified that "Plaintiff did not and does not challenge in this proceeding the validity of the guilty verdict or sanction resulting from the booking[.]"   ECF 47, p.7.   As such, Plaintiff has clarified that his Eighth Amendment claim solely relates to the conditions under which he was confined after being disciplined, not the actual disciplinary conviction.   Plaintiff suggests that the claim also pertains to the duration of his disciplinary confinement, although given his statement that this claim does not relate to the validity of any underlying sanction, that aspect of the claim is not clear.   *See* ECF 47, p.6.

The Eighth Amendment is implicated "if, in the circumstances, [the punishment] is extremely disproportionate, arbitrary or unnecessary." *O'Brien v. Moriarty*, 489 F.2d 941, 944 (1st Cir. 1974). The First Circuit has expressly recognized that disciplinary confinement "may be a necessary tool of prison discipline, both to punish infractions and to control and perhaps protect inmates whose presence within the general population would create unmanageable risks." *Id.* Trafficking narcotics in prison is an extremely serious offense that poses a grave danger to prison order and security and that risks inmate lives. *See Wheelock v. State of Rhode Island*, CA No. CIV.A.00-144-T., 2002 WL 982381 (D.R.I. April 8, 2002) ("The unauthorized use of narcotics in a prison by inmates poses a serious threat to prison officials' ability to maintain institutional safety."); *Williams v. Wall*, No. 06-12S, 2006 WL 2854296, at *2 (D.R.I. Oct. 4, 2006) ("The governmental interest in maintaining prison order is particularly strong and the U.S. Supreme Court has noted the threat to institutional security posed by inmate drug use."). It is also an offense that especially calls for the inmate's separation from the general population, not only as punishment, but also to protect other inmates and to halt the trafficking. Plaintiff has admitted that he engaged in an organized effort to bring the lethal drug fentanyl into the ACI. The seriousness of this offense cannot be overstated. Indeed, the Rhode Island Superior Court found the offense serious enough to sentence Plaintiff to five years' imprisonment. *See* P2-2021-0683A. In these particular circumstances, where Plaintiff has admitted to committing an extremely serious crime while confined at the ACI and one that risked the lives of other inmates, an extended sentence in disciplinary confinement cannot be said to be "extremely disproportionate, arbitrary or unnecessary." *O'Brien*, 489 F.2d at 944.

"The Constitution does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U. S. 337, 349 (1981). In order to meet the high threshold necessary for establishing an Eighth

Amendment claim, "the alleged deprivation of adequate conditions must be objectively serious, that is, the conditions of confinement must have deprived the plaintiff of 'the minimal civilized measure of life's necessities.'"  *Restucci v. Clarke*, 669 F. Supp. 2d 150, 155-156 (D. Mass. 2009) (quoting *Rhodes*, 452 U.S. at 347).  Not long ago, the Rhode Island District Court adopted a report and recommendation holding that Plaintiff's Eighth Amendment claim was not viable in a case where an inmate was placed in disciplinary confinement for 365 days as a sanction for narcotics trafficking (the same sanction Plaintiff received for trafficking narcotics).  *Harris v. Perry*, C.A. No. 15-222ML, 2015 WL 4879042, at *6 (D.R.I. July 15, 2015).  The decision noted that "[d]isciplinary segregation, even for periods as long as twenty six months, does not constitute cruel and unusual punishment."  *Id.*; *see also Rahman X v. Morgan*, 300 F.3d 970, 974 (8th Cir. 2002) (finding that 26 months in segregation did not violate Eighth Amendment because the deprivations "are not necessary for a civilized life" in case where plaintiff alleged "numerous hardships" that resulted from this placement, including lack of access to television in his cell, lack of access to the commissary, being prohibited from possessing certain items like ballpoint pens and batteries, and being deprived of outdoor yard privileges for several months).

Here, Plaintiff alleges he was deprived of a mirror, newspapers, radio, a television, and an MP3 player.  *See* ECF 38 ¶¶ 62-63.  These items are "not necessary for a civilized life."  *Rahman X*, 300 F.3d at 974.  Moreover, whereas the plaintiff in *Rahman X* was not permitted to go outdoors but was permitted to go to a day room to exercise three times a week, Plaintiff pleads he was permitted outdoors and had at least "45-60 minutes of out-of-cell time each day on Mondays through Fridays."  *See* ECF 38 ¶ 62.  Plaintiff also acknowledges he had access to a social worker. ECF 38 ¶ 85.  Moreover, as much as Defendants appreciate the important rehabilitative purpose of prison, "the courts have not recognized a constitutional right to rehabilitation for prisoners."

*Lovell v. Brennan*, 566 F. Supp. 672, 689 (D. Me. 1983), aff'd, 728 F.2d 560 (1st Cir. 1984);

*Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (regarding "prisoner classification and eligibility

for rehabilitative programs . . . Congress has given federal prison officials full discretion to control

these conditions of confinement, . . . and petitioner has no legitimate statutory or constitutional

entitlement sufficient to invoke due process").   Having limitations on the availability of

programming "do[es] not inflict pain, much less unnecessary and wanton pain; deprivations of this

kind simply are not punishments." *Rhodes*, 452 U.S. at 348.  One federal court has explained that

"[w]hile there can be little doubt of the desirability of maintaining a meaningful schedule of

programmed activity for inmates, the courts have never found that a failure to provide

rehabilitative programs to be objectionable on constitutional grounds." *Jaben v. Moore*, 788 F.

Supp. 500, 505 (D. Kan. 1992).  As such, the alleged deprivations complained of by Plaintiff do

not implicate the Eighth Amendment and are less than the alleged deprivations in other cases where

federal courts have determined that the Eighth Amendment was not violated.

Plaintiff has also not pleaded any facts that could demonstrate deliberate indifference on

the part of any of the named Defendants in this particular case.  *See Giroux v. Somerset County*,

178 F.3d 28, 32 (1st Cir. 1999) ("the official involved must have had 'a sufficiently culpable state

of mind,' described as 'deliberate indifference' to inmate health or safety" (citing *Farmer v.*

*Brennan*, 511 U.S. 825, 839-40 (1994))).  "[O]nly the unnecessary and wanton infliction of pain

implicates the Eighth Amendment." *Farmer*, 511 U.S. at 834 (internal citations omitted).  In order

to state a claim and implicate the Eighth Amendment, "the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists, and he must

also draw the inference." *Id.* at 837.  "[T]his standard, requiring an actual, subjective appreciation

of risk, has been likened to the standard for determining criminal recklessness." *Burrell v. Hampshire Cty.*, 307 F.3d 1, 8 (1st Cir. 2002) (quoting *Giroux*, 178 F.3d at 32).

Deliberate indifference is an essential component to an Eighth Amendment claim and requires a significant showing of a subjective intent to cause harm. Plaintiff fails to plead facts from which it could be concluded that any of these particular named Defendants acted with deliberate indifference with regard to Plaintiff's conditions of confinement, especially in light of Plaintiff's admission that he participated in an organized effort that trafficked fentanyl into the prison and that even while being disciplined for that conduct, he continued to commit additional infractions and break prison rules. *See* ECF 38 ¶ 74 (acknowledging Plaintiff accumulated additional bookings after being disciplined for trafficking narcotics). Especially in light of the particular circumstances of this case and the above-cited precedent, where inmates who experienced similar or more deprivations than Plaintiff did not establish an Eighth Amendment violation, there are no facts pleaded to support an allegation that Plaintiff's confinement violated established constitutional norms or was a result of a knowing intent to cause harm by any of these named Defendants rather than the result of Defendants' legitimate concerns for prison order and safety and keeping other inmates safe from potentially deadly narcotics trafficking in prison. Indeed, given that Plaintiff's decision to ingest narcotics resulted in his overdose, and given his admission that he continued attempting to ingest illicit substances while being disciplined (ECF ¶ 74), disciplinary confinement was also a means of attempting to keep Plaintiff safe.

Plaintiff names Defendants Bibeault and Cabral in this count, but did not plead any facts suggesting that they have any control or responsibility over the conditions in which inmates are housed in disciplinary confinement. Nor does Plaintiff plead that these Defendants have any control over the duration of time in which Plaintiff was housed in disciplinary confinement.

Plaintiff's allegations against Defendants Bibeault and Cabral, who are investigators, solely relate to their role in the investigation and bookings, but not to the conditions in which he was housed or the disciplinary sanction he received.  As such, Plaintiff has not pleaded any facts that could be the basis for an Eighth Amendment conditions of confinement claim against these Defendants and the Eighth Amendment claim against them should be dismissed.

Plaintiff likewise fails to plead an Eighth Amendment claim against each of the remaining Defendants.  Plaintiff's accusations against the Defendants — that they each "deliberately and recklessly plac[ed] him at substantial risk of serious harm," ECF 38 ¶ 99 — are highly generalized and conclusory, devoid of any "further factual enhancement." *See Iqbal*, 556 U.S. at 678 (pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'") (internal citations omitted).  As more fully discussed below in the context of discussing qualified immunity, Plaintiff has failed to state an Eighth Amendment claim against any of these Defendants, and has certainly not pleaded facts related to any Defendant that would justify waiving their qualified immunity.  *See infra* p.35-43.

Additionally, federal courts have held that symptoms similar to the ones Plaintiff alleged here – weight loss, appetite loss, and insomnia caused by emotional distress – do not constitute a "physical injury" for purposes of the PLRA. *See Davis v. District of Columbia*, 158 F.3d 1342, 1349 (D.C. Cir. 1998); *see also Chatham v. Adcock*, 334 F. Appx. 281, 285 (11th Cir. 2009) (plaintiff's claims of anxiousness, nausea, nightmares, hallucinations and increase in blood pressure are insufficient to satisfy the Section 1997e(e) physical injury requirement). Accordingly, this claim also fails to satisfy the requirements of the PLRA.

2.   Plaintiff Is Not Entitled to Any of the Relief He Seeks

Plaintiff's Complaint seeks damages and certain injunctive relief.  An additional reason Plaintiff's Eighth Amendment claims fails is because he is not legally entitled to any of the relief he seeks.  These arguments also apply to the other counts in the Complaint discussed above.

    a.   *Plaintiff is not entitled to damages against the Defendants in their official capacity*

Plaintiff's request for damages against the Defendants in their official capacities is barred because the State cannot be liable for damages in an action brought pursuant to § 1983.  *Will v. Michigan,* 491 U.S. 58, 71 (1989).  Section 1983 provides in relevant part:

> **Every person** who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….

> (Emphasis added).

The United States Supreme Court has made clear that "neither a State nor its officials acting in their official capacity are 'persons' under §1983."  *Will,* 491 U.S. at 71. "Based on the Supreme Court's holding in *Will*, it is clear that neither the State of Rhode Island nor any of its officials acting in their official capacities, are 'persons' that can be held liable under § 1983."  *Jones v. State of Rhode Island*, 724 F. Supp. 25, 28 (D.R.I. 1989) (dismissing plaintiffs' claims under § 1983 which were brought against the State of Rhode Island or an individual sued in his official capacity as an employee of the State.)   As the First Circuit put it, "[i]t is settled beyond peradventure…that neither a state agency nor a state official acting in his official capacity may be sued for damages in a section § 1983 action."  *Johnson v. Rodriguez,* 943 F.2d 104, 108 (1991). Accordingly, Plaintiff's Complaint must be dismissed to the extent it seeks damages against the Defendants in their official capacities.

b. _Defendants are entitled to qualified immunity in their individual capacity_

Plaintiff's damages claim against the Defendants in their individual capacities is barred by qualified immunity. The doctrine of qualified immunity precludes suits for money damages against state officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Bilida v. McCleod*, 211 F.3d 166, 174 (1st Cir. 2000) (citing *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)).

Qualified immunity is "an immunity from suit rather than a mere defense to liability [which]… is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Id.* at 526. The qualified immunity defense exists not only to shield officials from liability for damages, but also to protect from "the general costs of subjecting officials to the risks of trial — distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow*, 457 U.S. at 816.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged action." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations and quotations omitted). Courts may skip the first prong, i.e. whether there was a constitutional violation and proceed directly to the "clearly established" inquiry. *See Pearson v. Callahan*, 555 U.S. 223 (2000). A government official's conduct violates "clearly established law when at the time of the challenged conduct, the contours of a right are

sufficiently clear that every reasonable officer would have understood that what he is doing violates the right." 563 U.S. at 741 (citations and quotations omitted).

For qualified immunity to be surrendered, pre-existing law must "dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A&M Univ.,* 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc) (citing *Anderson, supra*). Moreover, it is not enough for the constitutional right to be "clearly established" at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood that his conduct violated clearly established law. *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998). The objective reasonableness determination is for the Court to make, and not for the jury. *DeAbadia v. Izquierdo Mova*, 792 F.2d 1187 (1st Cir. 1986). "The question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted." *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017).

Plaintiff's Eighth Amendment allegations against each of the Defendants are conclusory and bare bones. He has not sued the staff who convicted him of the disciplinary infractions at issue in this case or who determined his punishment and sentenced him to a certain number of days in disciplinary confinement. Many of the paragraphs in his complaint do not pertain to any particular Defendant at all. Additionally, many of the Defendants are sued simply by virtue of their supervisory position, without pleading factual allegations regarding particular conduct and/or knowledge on their part that would be a basis for waiving qualified immunity. *See Penate v. Hanchett*, 944 F.3d 358, 367 (1st Cir. 2019) (rejecting argument for relaxed pleading standard and reversing denial of motion to dismiss where plaintiff failed to plead facts establishing "that his or

her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization" (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012))).  Liability cannot rest on a defendant's position of authority alone. *Id.* at 367 (citing *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 16 (1st Cir. 2011)).  To sustain an Eighth Amendment damages claim against any of these Defendants in their *individual* capacity, Plaintiff must plead *facts* against that Defendant to allege deliberate indifference and to warrant stripping them of their qualified immunity and subjecting them to personal liability for damages. He has failed to do so.

As noted above, Plaintiff has not alleged that Investigators Bibeault or Cabral had any control over Plaintiff's conditions or duration of disciplinary confinement.

Regarding Director Coyne-Fague, Plaintiff pleads in conclusory terms that she "authorized or condoned" "the denial of adequate mental health care, and [Plaintiff's] placement in a correctional setting that was, and continues to be, harmful to his health," ECF 38 ¶ 14, but Plaintiff does not plead any *facts* to support those highly generalized accusations.  Besides generally pleading that Director Coyne-Fague has general supervisory responsibility pursuant to R.I. Gen. Laws § 42-56-5, Plaintiff does not plead any other facts related to Director Coyne-Fague and his Eighth Amendment claim.

Regarding now-retired Assistant Director Kettle, Plaintiff similarly pleads in cookie-cutter fashion that Assistant Director Kettle "authorized or condoned" "the denial of adequate mental health care, and [Plaintiff's] placement in a correctional setting that was, and continues to be, harmful to his health."  ECF 38 ¶ 13.  Plaintiff pleads that Director Kettle approved his classification downgrade from medium security, ECF 38 ¶¶ 45-46, but as discussed *infra* p.43-45, none of Plaintiff's claims allege that his classification status is unconstitutional.  Plaintiff does not

even identify why the status downgrade was inappropriate in light of the fact that Plaintiff participated in conveying fentanyl into the ACI. Plaintiff does not plead any facts to suggest that Assistant Director Kettle's approval of his downgrade from medium security was unconstitutional in the wake of Plaintiff's disciplinary convictions for multiple narcotics-related offenses — disciplinary convictions which Plaintiff does not challenge. Plaintiff pleads that Assistant Director Kettle denied Plaintiff's appeals of his disciplines, *see* ECF 38 ¶ 83, but does not plead why doing so was unconstitutional or why it is relevant to this lawsuit given Plaintiff's profession that he is not challenging the disciplinary convictions. In any regard, Plaintiff's own pleading showcases the careful and thoughtful approach Assistant Director Kettle takes when reviewing disciplines:

> "I review the appeal, I look at every case, I listen to it… Anyone doing long-term disciplinary confinement has the ability to write to the Warden and have their time suspended. I will look at it, I review it, and I talk to the staff members, how are they doing, I will suspend some of their time. … If Mental Health writes me and says that being housed in disciplinary confinement has been detrimental to that inmate's health, automatically we're releasing them and moving them out because something is going on."

ECF 38 ¶ 80. Plaintiff does not plead any other facts regarding retired Assistant Director Kettle that could conceivably relate to the Eighth Amendment claim. As with Director Coyne-Fague, Plaintiff's Eighth Amendment claim against Assistant Director Kettle is conclusory and fails to state a claim. It certainly does not establish any basis for finding that Assistant Director Kettle demonstrated deliberate indifference with regard to Plaintiff, or violated a clearly established constitutional right, such that the retired Assistant Director should be deprived of his qualified immunity and subjected to potential personal liability in this lawsuit.

Regarding Deputy Warden Diniz, Plaintiff pleads that he "is responsible for planning, organizing, and directing custodial and correctional services in the Medium Security facility; ensuring compliance with facility policies; and maintaining humane levels of inmate care." ECF

38 ¶ 12.   Plaintiff pleads that he asked Deputy Warden Diniz to suspend his discipline time in November 2019 and the request was denied.   ECF 38 ¶ 87.   But Plaintiff does not plead any facts to demonstrate that he had a "clearly established" constitutional right to have his disciplinary time suspended by Deputy Warden Diniz just several months after conveying fentanyl into the ACI. Indeed, a Rhode Island Federal District Court found that an identical 365-day disciplinary sentence for trafficking narcotics did not violate the Eighth Amendment.   *See Harris*, 2015 WL 4879042, at *6.   In light of this precedent, there is absolutely no support for the proposition that a 365-day disciplinary sentence for trafficking narcotics violated a constitutional right that was clearly established in the relevant caselaw such that every official would know that such a sentence violated the constitution in the circumstances of this case and would be required to suspend the disciplinary time.   Additionally, Plaintiff does not plead that Deputy Warden Diniz is the one who convicted and sanctioned Plaintiff, and Plaintiff has represented the sanction itself is not at issue in this lawsuit.   Plaintiff does not plead any facts suggesting that Deputy Warden Diniz had any knowledge of or involvement in any allegedly unconstitutional conditions of confinement, which is the topic of the Eighth Amendment claim.   As such, Plaintiff has failed to plead any facts that would warrant stripping Defendant Diniz of qualified immunity.

Regarding retired Deputy Warden Aceto, Plaintiff pleads in generalized fashion that Deputy Warden Aceto "planned, organized, and directed the custodial and correctional services and programs in the High Security Facility; was in charge of establishing facilities' policies and maintaining humane levels of inmate care; and had final discretion on disciplinary sanctions. Aceto was aware of Mr. Cintron's suffering yet refused to take any action, including suspending some or all of his disciplinary segregation time."   ECF 38 ¶ 15.   Plaintiff pleads that he wrote letters to Deputy Warden Aceto "telling him about his mental health breakdowns and appealing for his

39

remaining time in segregation to be suspended" and that Aceto refused.  ECF 38 ¶ 86.  Plaintiff also pleads on "information and belief" that his social worker spoke with Deputy Warden Aceto about Plaintiff's mental health.  ECF 38 ¶ 87.  Plaintiff does not plead any facts regarding the date or content of these letters or the communication from a social worker that Plaintiff "believes" occurred.  Plaintiff also does not plead facts demonstrating that Deputy Warden Aceto knew that disciplinary confinement was allegedly causing Plaintiff harm, especially where Plaintiff pleads that he experienced traumatic and distressing events in his life around that time period that had nothing to do with his confinement, such as the death of his grandfather and the suicide of his young niece.  *See* ECF 38 ¶ 71. Plaintiff also admits that he had access to a social worker.  ECF 38 ¶ 85.  Moreover, Plaintiff was convicted of multiple extremely serious disciplinary offenses that led to his disciplinary confinement and has admitted in his pleadings that upon being placed in disciplinary confinement, he continued to violate prison rules, "accumulating additional bookings."  ECF ¶ 74.

*Even assuming* it could be argued that Deputy Warden Aceto should have suspended Plaintiff's discipline time, the standard for pleading an Eighth Amendment claim against Deputy Warden Aceto in his individual capacity is far higher.  It requires pleading facts demonstrating that Deputy Warden Aceto knowingly engaged in "the unnecessary and wanton infliction of pain" upon Plaintiff, actually drew the inference that his conduct would inflict a substantial risk of serious harm on Plaintiff, and violated clearly established constitutional rights.  *See Farmer*, 511 U.S. at 834; *Burrell*, 307 F.3d at 8; *Lassiter*, 28 F.3d at 1150 (For qualified immunity to be surrendered, pre-existing law must "dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.").

Here, the record is undisputed that Plaintiff engaged in the extraordinarily serious offense of trafficking fentanyl into prison, continued to break prison rules even while being disciplined for that offense, and had access to a social worker while in disciplinary confinement.  Even assuming, as Plaintiff pleads, that Deputy Warden Aceto was aware that Plaintiff claimed to be experiencing mental health problems, that does not sufficiently plead that Deputy Warden Aceto was subjectively aware that Plaintiff's conditions of confinement were what was causing the problems and that the ongoing disciplinary confinement was "unnecessary" and "wanton" in light of Plaintiff's conduct.  Neither does Plaintiff plead facts demonstrating that Deputy Warden Aceto had a clear constitutional obligation to release Plaintiff from disciplinary confinement upon Plaintiff asking him to do so.  Courts have repeatedly recognized the difficulty, expertise, and judgment calls that go into day-to-day decisions regarding managing prisons.  *See, e.g., Sandin v. Conner*, 515 U.S. 472, 482 (1995) (describing "the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment").  Here, Plaintiff does not plead facts indicating that the decision to not suspend his disciplinary time was any more than one of those judgment calls made in good faith in light of Plaintiff's repeated refusals to follow prison rules, especially where Plaintiff's conduct was of a nature such that it jeopardized institutional security and inmate lives.  This decision was also made against the backdrop of local, on-point precedent determining that a 365-day disciplinary sentence for trafficking narcotics did not violate the Eighth Amendment.  *See Harris*, 2015 WL 4879042, at *6.

Regarding Warden Corry, Plaintiff pleads, nearly verbatim as he did with regard to Defendant Aceto, that she "plans, organizes, and directs the custodial and correctional services and programs in the High Security Facility; is in charge of establishing facilities' policies and

maintaining humane levels of inmate care; and has final discretion on disciplinary sanctions. Corry was aware of Cintron's suffering yet refused to take any action, including suspending some or all of his disciplinary segregation time."  ECF 38 ¶ 16.   Plaintiff pleads "[u]pon information and belief" that his social worker "spoke separately with Warden Aceto and then-Deputy Warden Lynne Corry about Mr. Cintron's deteriorating mental health condition and that she refused to suspend the remainder of his disciplinary time."  ECF 38 ¶ 87.  Plaintiff does not allege that then-Deputy Warden Corry had any authority to suspend his disciplinary sentence when Warden Aceto declined to do so.  Plaintiff also pleads that when Defendant Corry became the new Warden of High Security, Mr. Cintron wrote again asking for the remainder of his disciplinary time to be suspended and she responded:

> "I understand that you are going through things at this time however the way to suspend your discipline time is as easy as stop being disciplined. This is a difficult time for all, and sacrifices must be made for the greater health of all around us. Occupy your time by writing letters, journal things and share with Social Worker Ferro are a few suggestions to occupy your time. Your actions and behavior are what is holding you back from a discipline time suspension."

ECF 38 ¶ 88.  Far from alleging unconstitutional behavior, Plaintiff's pleading demonstrates that Warden Corry empathetically and thoughtfully considered and responded to Plaintiff's request to suspend his disciplinary time.  The pleading shows that the chief reason Warden Corry declined to suspend Plaintiff's time was because Plaintiff was continuing to break prison rules.  Warden Corry noted that Plaintiff's own "actions and behavior" were what was holding him back from having his disciplinary time suspended and provided suggestions for how Plaintiff could progress, including by working with his social worker.  In these circumstances, and for many of the same reasons noted above with regard to Deputy Warden Aceto, Plaintiff has not alleged any facts that would show a constitutional violation by Warden Corry, never mind deliberate indifference or a violation of a clearly established constitutional right.

Qualified immunity is designed to protect government officials from the burdens and risks of litigation for conduct that involved reasonably using their discretion in the course of doing their job.  Plaintiff's Complaint does not identify any controlling legal authority that would provide any of these Defendants with *clear* notice that their conduct fell short of some *established* constitutional norm, especially in light of Federal Court precedent regarding the seriousness of narcotics-related offenses by inmates and of federal cases upholding similar disciplinary confinements.  *See Wheelock*, 2002 WL 982381 ("The unauthorized use of narcotics in a prison by inmates poses a serious threat to prison officials' ability to maintain institutional safety."); *see also supra* p.29-31.  Nor does Plaintiff allege facts showing that an objective, reasonable official in these Defendants' position would have known their conduct violated a rule of law.  Because qualified immunity is "an immunity from suit" for these individual corrections officers, *Mitchell*, 472 U.S. at 526, dismissal of them from the case in their individual capacities is warranted, especially given the extensive and burdensome discovery that Plaintiff is seeking in this case.

        c.   <u>*Plaintiff's requests for injunctive relief are not viable*</u>

For injunctive relief, Plaintiff requests a "preliminary and permanent injunction requiring . . . reclassification to Medium Security." ECF 38, p.21.  This request for relief is not tied to any claim raised in Plaintiff's complaint as none of Plaintiff's seven counts specifically pertain to his classification status or allege that his classification is unconstitutional.  As repeatedly noted above, Plaintiff was convicted of multiple serious disciplinary offenses and specifically represents that this lawsuit is not challenging his disciplinary sanctions or convictions.  Moreover, Plaintiff has expressly admitted to conveying fentanyl into the ACI.  Plaintiff has not pleaded any count contesting the appropriateness of his classification to a more serious security level given these circumstances.  Moreover, under the PLRA, "the court shall not enter a preliminary injunction

43

unless it finds that the injunctive relief is 'narrowly drawn, extend[s] no further than necessary to correct the harm the court finds requires preliminary relief, and [is] the least intrusive means necessary to correct that harm.'" *Tavares v. Macomber*, No. CV 18-606MSM, 2019 WL 6696142, at *2 (D.R.I. Dec. 9, 2019), report and recommendation adopted (Sept. 3, 2020) (quoting 18 U.S.C. § 3626(a)(2)). "Further, the court considering an interim injunction 'shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief.'" *Id.* (quoting 18 U.S.C. § 3626(a)(2)). Plaintiff's request for injunctive relief regarding his security classification is baseless. A preliminary and permanent injunction overriding the Department of Corrections' determination regarding the security status of an inmate who conveyed narcotics into the facility would jeopardize institutional safety and be inconsistent with the Court's practice to avoid interfering with the day-to-day management of prisons. *See id.* ("courts must be guided by Congress's 'ambient intent' to curb the involvement of the federal judiciary in the day-to-day management of prisons").

Additionally, the Rhode Island Supreme Court has held that "prison inmates have 'no constitutional or statutory protected liberty interest in the present prison-inmate classification process used in this state.' Under our current inmate classification statutes, 'the director of the Department of Corrections has unfettered discretion in the inmate-housing classification process.'" *DeCiantis v. Rhode Island Dep't of Corr.*, 840 A.2d 1090, 1092 (R.I. 2003) (quoting of *Bishop v. State*, 667 A.2d 275, 277 (R.I.1995)). The Court held that "[i]nmate classification is a confidential administrative matter squarely within the DOC director's exclusive discretion. As such, prison inmates 'cannot under the guise of post conviction relief * * * transpose the Superior Court into an appellate prison-inmate classification board.'" *Id.* (quoting of *Bishop*, 667 A.2d at 277 (R.I.1995)). The Rhode Island Federal District Court has cited the *Bishop* decision from the Rhode

Island Supreme Court for the proposition that "[u]nder *Bishop*, an inmate has no statutory liberty interest in his housing or classification." *Letourneau v. Wall*, No. CA 12-848-M, 2013 WL 2181294, at *4 (D.R.I. May 20, 2013). For all these reasons, Plaintiff's request for injunctive relief related to his classification status is not legally viable and must be rejected.

To the extent Plaintiff seeks injunctive relief removing him from "disciplinary segregation," ECF 38, p.21, that request for relief likewise fails. As an initial matter, and as repeatedly noted above, Plaintiff expressly professed that his lawsuit does not pertain to his disciplinary conviction or sanction. Moreover, Plaintiff received the discipline in question, which Plaintiff alleges collectively amounted to 450 days in disciplinary confinement, in July and August 2019. ECF 38 ¶ 55. Even assuming that Plaintiff served 450 days in disciplinary confinement in connection with the discipline he received in July and August 2019, more than 450 days have passed since then. Additionally, Plaintiff's request for relief is to be removed from "disciplinary segregation," but Plaintiff pleads that "Mr. Cintron left disciplinary segregation in September 2020." ECF 38 ¶ 75. For all these reasons, the disciplinary confinement that was the basis for this action has been completed and Plaintiff's request that this Court remove him from such confinement is moot. *See CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 621 (1st Cir. 1995) (requested relief "is rendered moot when the act sought to be enjoined has occurred"). Any subsequent disciplinary infractions Plaintiff may have committed or may have been punished for are not the subject of Plaintiff's claims in this case and are not an appropriate subject for relief in this case.

Plaintiff's final request for injunctive relief is for "[a] preliminary and permanent injunction prohibiting Defendants from further retaliation against Plaintiff." ECF 38, p.21. As noted above, under the PLRA, injunctive relief must be narrowly drawn. Here, Plaintiff's

unspecific request does not make clear the nature of any particular relief being sought. For the reasons discussed above, Plaintiff's claim that any Defendants retaliated against him fails as a matter of law and even if he had been retaliated against in the past, he has not pleaded any facts regarding any particular future threat of retaliation by any of the named Defendants that he is seeking to enjoin. This request for relief is not viable.

For all these reasons, none of the relief Plaintiff requests, injunctive or monetary, is appropriate or viable.

## CONCLUSION

Disciplinary confinement is a necessary tool for punishing inmates who commit serious infractions, especially infractions that risk inmates' lives like conveying fentanyl into the ACI. Plaintiff is upset that he was placed in disciplinary confinement for participating in trafficking fentanyl into the ACI. But for the quick response of Department of Corrections personnel, the drugs Plaintiff chose to ingest and overdosed on very well could have killed him or another inmate. No party to this case thinks disciplinary confinement is ideal, but there are circumstances when it is necessary. Similarly, no one disputes that progress can and should continue to be made on improving disciplinary confinement. But this is a case where the injunctive relief Plaintiff seeks is not viable and/or is moot. It is also a case where damages against the Defendants in their official capacities is barred as a matter of law and there are no factual allegations that would warrant subjecting these Defendants to individual liability and the waiver of qualified immunity in connection with Plaintiff being disciplined for serious violations of prison rules, especially where Plaintiff acknowledges that he conveyed fentanyl into the ACI and continued to break prison rules even after being disciplined. Plaintiff has recently served on Defendants 43 interrogatories, noticed 10 depositions and/or non-party subpoenas, and seeks additional records after already

46

being provided with over 2,000 pages.  There is no doubt that responding to these outstanding discovery requests and continued litigation of this case will pose a great burden on these Defendants.  That burden is unwarranted given the current circumstances in this particular case, including Plaintiff's guilty plea in the criminal proceedings admitting that he participated in an organized effort to convey fentanyl into the ACI and the fact that his disciplinary sentence related to that charge has already expired.

Defendants respectfully ask that this Court grant their Motion for Judgment on the Pleadings.  Defendants do not specifically request a hearing but are happy to present oral argument if it would be helpful to the Court.

.

Respectfully submitted,

DEFENDANTS,

By:

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Katherine Connolly Sadeck*
Katherine Connolly Sadeck (#8637)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2480
(401) 222-2995 (Fax)
Ksadeck@riag.ri.gov

## <u>CERTIFICATION</u>

I, the undersigned, hereby certify that I have filed the within Document via the ECF System and that it is available for viewing and downloading on this 5th day of May 2022.  A copy has also been sent via the ECF filing system to counsel of record for Plaintiff:


Natalia Friedlander (#10003)
Jennifer L. Wood (#3582)
nfriedlander@centerforjustice.org
jwood@centerforjustice.org

*/s/ Katherine Connolly Sadeck*
_____

48