## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
```
                                          :
JERRY CINTRON,                            :
        Plaintiff,                        :
                                          :
             v.                           :
                                          :
PAUL BIBEAULT, STEVE CABRAL,              :
RUI DINIZ, MATTHEW KETTLE,                :
PATRICIA COYNE-FAGUE, JEFFREY             :
ACETO, and LYNNE CORRY,                   :
        Defendants.                       :
                                          :
```
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

C.A. No. 1:19-cv-00497-JJM-PAS

### PLAINTIFF'S OPPOSITION TO DEFENDANTS'
### MOTION FOR JUDGMENT ON THE PLEADINGS

By and through counsel, Plaintiff respectfully submits this Opposition to Defendants'

Motion for Judgment on the Pleadings. For all the reasons set forth herein, Plaintiff respectfully

requests that the Court deny Defendants' Motion.

1

**TABLE OF CONTENTS**

**I. Procedural History**                                                          **3**

**II. Statement of Facts**                                                         **5**

**III. Legal Standard**                                                            **8**

    *A.   Conversion would be Inappropriate*                   *8*

    *B.   Parties can Incorporate Information Obtained in Discovery in a Motion for*

        *Judgment on the Pleadings*                *10*

**IV. Analysis of Claims**                                                         **11**

    *1. Count 1: Eighth Amendment (Cruel and Unusual Punishment)*    *11*

      A.   Plaintiff States a Claim for Violation of his Eighth Amendment Rights   12

      B.   Plaintiff is Entitled to Relief                    16

    *2. Count 2: First Amendment (Freedom of Speech)*               *18*

      A.   PLRA § 1997e(e) Does Not Bar Plaintiff's Claims    18

      B.   Plaintiff is Not Required to Plead Exhaustion of Administrative Remedies   20

      C.   Plaintiff has Pled Sufficient Facts as to Defendants Bibeault, Cabral, and Diniz   20

        1.   Plaintiff engaged in constitutionally protected conduct   20

        2.   Plaintiff suffered an adverse action            22

        3.   There existed a causal connection between the constitutionally protected

          conduct and adverse action                   23

      D.   Qualified Immunity is an Affirmative Defense       26

      E.   Defendants' Allegations that Plaintiff is Engaging in Frivolous Litigation are

        Meritless                                        26

    *3. Count 6: Abuse of Process*                                 *26*

      A.   Defendant Bibeault Set in Motion the Criminal Charges   27

      B.   The Criminal Proceedings were Used for an Ulterior or Wrongful Purpose   31

    *4. Count 7: First Amendment (Access to Courts)*               *35*

      A.   Lack of Probable Cause is Not a Necessary Element of Plaintiff's Claim   36

      B.   Plaintiff Experienced Disparate Treatment vis-a-vis Similarly Situated Individuals   38

      C.   Plaintiff has Alleged Sufficient "Adverse Action" by Defendant Bibeault   39

      D.   Plaintiff's Complaint Satisfies the "Motivating Factor" Element of His

        Retaliation Claim                                40

**V. Request for Leave to Amend Complaint**                                        **42**

**VI. Conclusion**                                                                 **42**

**I. Procedural History**

On July 12, 2019, Mr. Jerry Cintron overdosed on opiates while in the custody of the Rhode Island Department of Corrections. In the aftermath of the overdose, he was issued four disciplinary bookings totaling 450 days in solitary confinement and was transferred to the High Security Center, Rhode Island's supermax prison. Until his reclassification to Maximum Security general population in approximately March 2022, Mr. Cintron spent more than two-and-a-half years in High Security or in restrictive housing at Maximum Security following his overdose and resultant bookings.

On September 20, 2019, Mr. Cintron filed a *pro se* complaint alleging Eighth and Fourteenth Amendment violations related to his bookings and subsequent placement in restrictive housing, which Defendants moved to dismiss. On July 21, 2020, he filed an amended complaint with the assistance of newly-appointed counsel. Plaintiff's amended complaint alleged violations by Defendants of the Eighth Amendment (cruel and unusual punishment), First Amendment (retaliation for protected speech), Fifth Amendment (retaliation for refusing to self-incriminate), intentional infliction of emotional distress, and negligent supervision.

Documents filed with the Rhode Island Superior and Supreme Courts confirm that an investigation into Mr. Cintron was paused after his overdose and resumed "[a] little more than a year later," Prebrief of Appellant-Rhode Island at 5, *Rhode Island v. Cintron*, SU-2021-0174-CA (R.I. Dec. 22, 2021), in September 2020, after counsel filed Plaintiff's amended complaint. On October 7, 2020, Cpl. Herbert Tilson of the Rhode Island State Police filed four criminal charges

against Plaintiff, Exhibit A, and the Attorney General's office simultaneously moved to violate Mr. Cintron's probation from a 2016 conviction. ECF 50-5.[1]

Mr. Cintron filed a proposed Second Amended Complaint on February 11, 2021 adding claims of abuse of process and violation of his First Amendment right of access to the courts, alleging that Defendant Bibeault was the driving force behind the new charges and that his pursuit of criminal charges against Plaintiff was in retaliation for Mr. Cintron's vigorous pursuit of civil litigation, marked by the appointment of counsel and filing of the amended complaint.

On March 9, 2021, the Attorney General's Office filed a four-count criminal Information against Plaintiff. On April 15, 2021, Mr. Cintron moved to dismiss all charges, and on May 28, 2021 the Superior Court granted the motion to dismiss as to Counts 3 and 4. The State filed an appeal of the dismissal of Counts 3 and 4 with the Supreme Court on July 23, 2021.

During the pendency of the criminal proceeding, Mr. Cintron was offered a plea deal that would require him to plead *nolo contendere* to the two remaining charges, and which would add no time to his sentence and make him immediately eligible for parole.[2] On March 31, 2022, Mr. Cintron accepted the State's offer and entered a plea of *nolo contendere* to a five-year sentence with one year to serve, to run concurrently with his existing sentence, and with 17.5 months credit for time served.[3] This disposition avoided any additional prison time for Mr. Cintron and he immediately became re-eligible for parole.

---

[1] As described in § IV(3)(A), p. 28 *infra*, although the investigatory report that forms the basis of both the criminal charges and the probation violation report is attributed to Cpl. Tilson, it appears to have been authored by, or drawn primarily from investigative reports written by, Defendant Bibeault.

[2] Because prisoners are ineligible for parole when they have pending criminal charges, Mr. Cintron was facing the possibility of parole ineligibility for two or more years while the Supreme Court appeal was pending.

[3] It is well recognized that "there are a number of reasons why a defendant might choose to plead guilty, . . . including shock, avoidance of financial and emotional cost, and hope for a lesser sentence." *Thore v. Howe*, 466 F.3d 173, 185 (1st Cir. 2006), *citing Carrasca v. Pomeroy*, 313 F.3d 828, 835 (3d Cir. 2002). *See also Haring v. Prosise*, 462 U.S. 306, 318-19 (1983).

On May 5, 2022, Defendants filed a Motion for Judgment on the Pleadings. ECF 50.

## II. Statement of Facts

The State has averred that on July 10, 2019, Destiny Valley conveyed a bag of narcotics[4] to Davante Neves, a former prisoner at Medium Security who has since deceased. Based on a description of the narcotics in the criminal Information, these drugs were likely in powder form.[5] Mr. Cintron played a minor role in the conveyance and was subsequently sentenced to time served with four years' probation, running concurrently with a prior sentence.[6] Mr. Cintron never saw the narcotics that the State alleged Ms. Valley conveyed to Mr. Neves, and he did not profit in any way from the conveyance.[7]

On July 12, 2019, in an unrelated incident, Mr. Cintron was handed just over half a pill from another prisoner, Craig Kelly, during afternoon recreation at Medium Security. The pill resembled and was marked as a blue Percocet 30mg. Mr. Cintron was an addict who struggled with untreated opioid use disorder, and he broke off a piece of the pill to taste it and took the rest nasally. Later that afternoon, he was found unresponsive in his cell, revived with Narcan by correctional officers, and taken to the Rhode Island Hospital Emergency Room. He was

---

[4] Ms. Valley described it as two balloons with unknown contents. ECF 50-1 at 35. The prosecutor described it as "a bag of fentanyl." ECF 50-4 at 13. Plaintiff has no direct knowledge as to the form or identity of the narcotics that were conveyed. In pleading guilty to conveyance and conspiracy to convey, Mr. Cintron relied in part on statements and assertions made by the State. *See Thore v. Howe*, 466 F.3d 173, 186 n.8 (1st Cir. 2006), *citing Jaffe v. Accredited Sur. & Cas. Co., Inc.*, 294 F.3d 584, 595 n.7 (4th Cir. 2002) (judicial estoppel does not apply when a party's assertedly inconsistent positions stem from reliance on statements made to the court by an opponent which later prove to be untrue).

[5] A confidential informant described the narcotics that Davante Neves smuggled in as "dope or molly" that looked "dark brown or white." ECF 50-1 at 73.

[6] The State alleged that Mr. Cintron's act in furtherance of the conveyance was giving Ms. Valley's phone number to Rafael Ferrer, ECF 50-1 at 14, who drove Ms. Valley to the ACI and gave her the drugs to pass to Davante Neves. In Ms. Valley's formal statement to Defendant Bibeault and Cpl. Herbert Tilson, she said that Neves—not Cintron—was the one who gave her number to Mr. Ferrer. ECF 50-1 at 33-34. Per the Information, Mr. Cintron had two brief calls with Mr. Ferrer on the evening of July 10, 2019 but the Information did not specify how these conversations allegedly furthered the conspiracy.

[7] The criminal charge of "conveyance" does not require a profit motive.

discharged from the hospital the following day. Following hospital testing, Mr. Cintron came to understand that the pill had been laced with fentanyl. Mr. Cintron has repeatedly stated that he does not know how the Percocet entered the facility.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

What follows is described in detail in Plaintiff's Second Amended Complaint. ECF 38 at 6-9. On July 17, 2019, four days after his return from the hospital, Mr. Cintron was booked for being under the influence of narcotics and was given 25 days in disciplinary segregation, 182 days loss of visits, and 25 days loss of good time. On July 22, Defendant Bibeault issued Mr. Cintron a second booking, for possessing homemade or purchased narcotics—specifically, for "purchas[ing] a pill laced with fentanyl"—for which he received 30 additional days in disciplinary segregation and 30 days loss of good time. This was Mr. Cintron's second booking for the same incident, which was contrary to RIDOC policy. During this period, Defendants Bibeault and Cabral repeatedly interrogated Mr. Cintron and threatened to "bury [him] alive" in segregation if he didn't cooperate with their narcotics investigation. *Id.* at 8.

On August 8, 2019, Mr. Cintron was reclassified to the High Security Center, Rhode Island's supermax facility, *Id*. at 9, where prisoners spend the substantial majority of their time in their cells.

On August 22, 2019, Defendant Bibeault issued Mr. Cintron a booking for trafficking in illegal substances, an infraction that carries 31 to 365 days in disciplinary segregation. *Id*. at 9. A

---

[8] This document was produced as Attorneys Eyes Only and is therefore being filed under seal. Plaintiff's counsel have not discussed the document or its contents with Plaintiff. Defendants have not responded to repeated requests to have the document de-designated as Attorneys Eyes Only.

booking for trafficking (infraction P43) requires a prisoner to have profited from the conveyance; in contrast, a booking for smuggling (infraction 102) does not contain a profit requirement and instead carries a sanction of up to 30 days in disciplinary confinement. Exhibit C, Code of Inmate Discipline, at 39, 44. He was adjudicated guilty on the trafficking booking and given the highest sanction: 365 days in solitary confinement. *Id*. at 10. All in all, Mr. Cintron received 450 days of disciplinary segregation as a result of four related bookings in July and August 2019. *Id.*

Mr. Cintron remained in restrictive housing until he was classified to general population at Maximum Security around March 2022, over two-and-a-half years after his overdose.

Although conditions in restrictive housing varied by facility and mod, they were generally characterized by extremely limited out-of-cell time and access to fresh air, contact with Mr. Cintron's family, and education and programming. ECF 38 at 11-12. At various times, Mr. Cintron was deprived of adequate clothing, news and mental stimulation (newspapers, TV, or radio), and his own reflection (through a mirror); while in disciplinary segregation, he was deprived of sleep and basic sensory comforts as the lights were kept on all night and he was constantly awoken by the loud bang of a cell locking. *Id.*

 As a result of conditions in segregation, Mr. Cintron lost almost 70 pounds and exhibited self-injurious behavior. He had intrusive thoughts, severe anxiety, and cried often. His relationship with his family and children deteriorated, and he had to start taking psychiatric medication. *Id*. at 12-13. He repeatedly asked to be removed from segregation and was denied. *Id*. at 15. Mr. Cintron spent another year in restrictive housing after the filing of his Second Amended Complaint; were the case to progress to further discovery, Plaintiff will testify about events subsequent to the filing of the complaint.

In July 2020, after obtaining counsel in his pending civil litigation, Mr. Cintron filed an amended complaint against Bibeault as lead defendant. Shortly thereafter, Bibeault initiated the process of having Mr. Cintron criminally charged.

## III. Legal Standard

An entry of judgment on the pleadings under Rule 12(c) "may not be entered unless it appears beyond a doubt that the nonmoving party can prove no set of facts in support of her claim which would entitle her to relief." *Feliciano v. Rhode Island*, 160 F.3d 780, 782 (1st Cir. 1998); *Parker v. Hurley,* 474 F. Supp. 2d 261, 267 (D. Mass. 2007), *aff'd*, 514 F.3d 87 (1st Cir. 2008). By contrast, "[s]ummary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (quoting Fed. R. Civ. P. 56(a)). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id*. at 657.

### A. Conversion would be Inappropriate

Defendants filed a Motion for Judgment on the Pleadings, which they note "may be converted into one for summary judgment."[9] ECF 50 at 10. Their Motion refers to and quotes records whose authenticity and accuracy remain in dispute.[10] For example, Defendants

---

[9] A Motion for Judgment on the Pleadings shall be treated as a Motion for Summary Judgment where matters outside the pleading are presented to and accepted by the court and where the non-moving party has a reasonable opportunity to present pertinent material. Fed. R. Civ. P. 12(b); *Maruho Co. v. Miles, Inc.*, 13 F.3d 6, 8 (1st Cir. 1993). The notice requirement for conversion can be satisfied "when a party receives constructive notice that the court has been afforded the option of conversion." *Collier v. City of Chicopee*, 158 F.3d 601, 603 (1st Cir. 1998).

[10] In ruling on a Motion for Judgment on the Pleadings, a court may consider "documents attached to or fairly incorporated by reference into the complaint whose authenticity is not disputed, documents from the public record that are susceptible to judicial notice, and concessions in the opposing party's response to the motion." *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013); *Pimental v. Wells Fargo Bank, N.A.*, No. 14-494S, 2015 U.S. Dist. LEXIS 120571, at *12 (D.R.I. Sep. 4, 2015). These categories

incorporate as facts a police narrative, alleged audio transcripts, and witness statements, whose authenticity and/or accuracy have not been established.[11] The Court also placed both Parties on notice of possible conversion in a communication on April 4, 2022.

Conversion would be inappropriate in this case, however, due to the limited discovery that the parties have engaged in thus far. *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 73-74 (1st Cir. 2014) (conversion is inappropriate where a party had "no reasonable opportunity to gather or present actual evidence pertinent to his claims); *Whiting v. Maiolini*, 921 F.2d 5, 7 (1st Cir. 1990).

Defendants assert that they have "produced over 2,000 pages of documents to Plaintiff." ECF 50 at 7. Of the 2,269 pages produced by Defendants, over 1,750 pages had already been in Plaintiff's possession or were available to him under HIPAA, including over a thousand pages of medical records, in addition to almost 90 pages that were blank or fully redacted. In total, Defendants produced about 300 pages of records concerning Plaintiff that had previously-unavailable information. Additionally, in spite of Plaintiff's diligent efforts, Defendants have only produced 21 pages of records that were otherwise unavailable to Plaintiff specifically regarding the investigation into Plaintiff's overdose that resulted in disciplinary action and subsequent criminal charges.

---

comprise a "narrow exception[]." *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 74 (1st Cir. 2014), *quoting Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

[11] Defendants characterize the criminal Information as "an official document filed on the docket of the Rhode Island Superior Court." ECF 50 at 2. Plaintiff agrees that the Information can be considered by the Court in adjudicating Defendants' Motion, but emphasizes that the act of filing a document on a public court docket does not convert its entire contents into "matter[s] of public record" and the Court is not required to take judicial notice of the truth of any statement of fact contained within those documents. Nor have the entire contents of the Information been "incorporated by reference" in Plaintiff's Second Amended Complaint, which was filed before the Information was published. As to the 32(f) violation report, which contains substantially similar information to the Information, references and limited quotations do not necessarily incorporate a record for Rule 12 purposes. *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988).

Furthermore, neither party has conducted depositions, and Defendants have not responded to any of Plaintiff's Interrogatories.

Given the state of discovery in the matter, Plaintiff would be unable to adequately respond to a Motion for Summary Judgment at this point. If the Court were to convert Defendants' Motion for Judgment on the Pleadings to a Motion for Summary Judgment, Plaintiff respectfully requests that the Court stay consideration of the converted Motion to allow Plaintiff to file an affidavit pursuant to Fed. R. Civ. P. 56(d).

## B. Parties can Incorporate Information Obtained in Discovery in a Motion for Judgment on the Pleadings

Plaintiff has filed five exhibits to his Response.[12] All material attached to this Response are already in Defendants' possession.

Consideration of these exhibits is appropriate in this case, where Defendants have shared some discovery relevant to portions of Plaintiff's claims, but an insufficient amount for summary judgment purposes. *Rios-Campbell v. United States DOC*, 927 F.3d 21, 26 (1st Cir. 2019) ("[G]oing through a lengthy period of discovery only to ignore the fruits of the discovery process by focusing single-mindedly on the adequacy of the allegations of the complaint would make little sense in the mine-run of cases."); *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 46 (1st Cir. 2012) ("[O]nce the parties have invested substantial resources in discovery, a district court should hesitate to entertain a Rule 12(c) motion that asserts a complaint's failure to satisfy the plausibility requirement."). The Court can thus consider these exhibits without converting Defendants' Motion to one for summary judgment.

---

[12] Exhibit B is being filed under seal.

## IV. Analysis of Claims

Plaintiff's first Amended Complaint included five counts: violation of his Eighth Amendment right to be free from cruel and unusual punishment (1), violation of his First Amendment right to refuse to serve as an informant (2), violation of his Fifth Amendment right to refuse to provide information to investigators (3), intentional infliction of emotional distress (4), and negligent supervision (5). His Second Amended Complaint added claims of abuse of process (6) and violation of his First Amendment right to petition the courts (7).

Plaintiff contends that Defendants' actions in maliciously placing him in solitary confinement for over a year were "extreme and outrageous conduct, resulting in the plaintiff's severe emotional distress," and that Defendants intended to cause such severe emotional distress. Plaintiff also maintains that Defendants' interrogation techniques were unduly coercive and placed him in fear of criminal prosecution.

Nonetheless, in light of information obtained in discovery from Defendants, Plaintiff concedes that he may be unable to muster a sufficient "set of facts in support of" Counts 3, violation of his Fifth Amendment right to refuse to provide information to investigators, 4, intentional infliction of emotional distress, and 5, negligent supervision, that would entitle him to relief on these counts at the summary judgment stage, and that the Defendants' motion may be granted as to these counts.

However, the Court should deny Defendants' Motion as to Counts 1, 2, 6, and 7, as they have not met their burden under Fed. R. Civ. P. 12(c).

### 1. Count 1: Eighth Amendment (Cruel and Unusual Punishment)

As described in Plaintiff's Second Amended Complaint, ECF 38 at 11-13, Defendants held Mr. Cintron in solitary confinement for over two-and-a-half years, in conditions that were

marked by extreme deprivation of—among other basic necessities—fresh air, contact with family and loved ones, and opportunities for mental stimulation and rehabilitation.

Defendants claim that Mr. Cintron has not pled sufficient facts to state a claim under the Eighth Amendment and that he is not entitled to relief under this count.

A.  *Plaintiff States a Claim for Violation of his Eighth Amendment Rights*

Defendants primarily cite two cases to support their claim that Mr. Cintron's confinement was not in violation of the Eighth Amendment. First, they cite *O'Brien v. Moriarty* for the proposition that "an extended sentence in disciplinary confinement cannot be said to be 'extremely disproportionate, arbitrary, or unnecessary.'" ECF 50 at 29, *citing O'Brien*, 489 F.2d 941, 944 (1st Cir. 1974). Second, they cite *Harris v. Perry* for the standard that "[d]isciplinary segregation, even for periods as long as twenty six months, does not constitute cruel and unusual punishment." C.A. No. 15-222ML, 2015 WL 4879042, at *6 (D.R.I. July 15, 2015). Defendants do not reference any cases post-*Harris*.

In *DuPonte v. Wall*, this Court found that a prisoner who was sentenced to a year of disciplinary confinement plausibly alleged, for the purposes of a Motion to Dismiss, an Eighth Amendment violation. *DuPonte v. Wall*, 288 F. Supp. 3d 504, 513-14 (D.R.I. 2018). Quoting the First Circuit's holding in *O'Brien*, this Court cautioned that "if imposed 'for too long a period, even the permissible forms of solitary confinement might violate the Eighth Amendment,'" and emphasized that "most cases upholding solitary confinement are where it is 'a short-term punishment for disciplinary infractions.'" *Id*. at 513 (quoting *O'Brien*, 489 F.2d 941, 944 (1st Cir. 1974)). The Court found it plausible that a reasonable fact-finder would conclude that the conditions alleged by Mr. DuPonte (which were substantially similar to those alleged by Mr. Cintron), combined with the duration of those conditions (which was shorter than the duration of

12

Mr. Cintron's disciplinary confinement), violate the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).[13]

The Court also found plausible the allegations that Defendants acted with deliberate indifference, drawing on the known substantial risk of serious harm inherent in placing a prisoner in solitary confinement, and that the knowledge could be plausibly charged to the Defendants due to RIDOC's participation in the Rhode Island Special Legislative Commission to Study and Assess the Use of Solitary Confinement at the Rhode Island ACI, which Mr. Cintron referenced at length in his Second Amended Complaint. ECF 38 at 14. Further, Mr. DuPonte plausibly alleged that Defendants ignored the risk of harm and acted with deliberate indifference.[14]

---

[13] In recent years, at least 10 states—including Connecticut, Colorado, Maine, Mississippi, New Jersey, New York, North and South Dakota, Oregon, Virginia, and Washington—have placed significant limitations on the use of solitary confinement. Courts should be mindful of evolving legislative landscapes, reflecting "extensive discussion of [issues] in both governmental and private sectors and [] a shift in public attitudes[,]" *Obergefell v. Hodges*, 576 U.S. 644, 661 (2015), as "new insight [may] reveal[ ] discord between the Constitution's central protections and a received legal stricture." *Id*. at 664. *See also id*. at 660 ("new dimensions of freedom become apparent to new generations, often through perspectives that begin in pleas or protests and then are considered in the political sphere and the judicial process"), 685, Appendix B (enumerating state laws that legalized same-sex marriage).

[14] The harms of solitary confinement have been understood in this state for over 150 years. In 1841, prison inspectors sent by the Rhode Island legislature recommended a complete end to the use of solitary confinement, stating that "the effect is to injure strong minds, and to produce imbecility or insanity in those that are weak," and calling the practice "severe" and "cruel." *Report of the Committee on the Affairs of the State Prison and Act Accompanying* (Jan. 17, 1843) (on file with the Rhode Island State Archives). They stated: "Your committee find a number of cases of Insanity among the prisoners and at the present time one or more of the convicts manifest strong symptoms of mental derangement. Man is a social being and to deprive him of all interactions for any length of time…disturb[s] the facilities and produce[s] derangement." *Id*. The report argued further that the practice "deprives [prisoners] of all knowledge of their families or connections," and of other activities "necessary for the health of the body." *Id*. Shortly after the release of the report, in January 1843, the Rhode Island General Assembly passed an act abolishing solitary confinement in the state prison. *See An Act in Amendment of an Act Entitled an Act Concerning Crimes and Punishments* (Jan. 18, 1843) (on file with the Rhode Island State Archives). Ten months later, in a letter to the legislature, a prison physician reported that prisoner health had been good for the year, writing: "there has been no case of alarming sickness, nor has there been any case of Insanity in the Prison since the abolishment of solitary confinement." Letter from Richmond Brownell, Physician to S.P., to the Honorable General Assembly, Rhode Island (Oct. 30, 1843) (on file with the Rhode Island State Archives).

The *DuPonte* Court cautioned against adopting *Harris*, as the Defendants have done, for the proposition that solitary confinement for "as long as twenty six months[] does not constitute cruel and unusual punishment." *Harris*, 2015 WL 4879042 at *6. Specifically, the Court stated:

> The Defendants cite an adopted report and recommendation by a magistrate judge in this district for the proposition that "[d]isciplinary segregation, even for periods as long as twenty six months, does not constitute cruel and unusual punishment." *Harris v. Perry*, No. 15-222 ML, 2015 WL 4879042, at *5 (D.R.I. July 15, 2015). For this proposition, *Harris* cites a footnote in an adopted report and recommendation from the United States District Court for the District of Minnesota, which discusses Eighth Circuit law that lengthy disciplinary confinement does not establish an Eighth Amendment violation. *See id.* (citing *Green v. Hearing Officer on Report 452704*, No. 14-857 ADM/BRT, 2015 WL 2381590, at *2 n.7 (D. Minn. May 19, 2015)). The Defendants make no effort to explain how—or if—the conditions of segregation alleged by Mr. DuPonte compare to those in the Eighth Circuit cases. This Court knows of no First Circuit precedent that establishes a permissible period of time for solitary confinement, where no shorter sentence could ever be considered cruel and unusual punishment.

*DuPonte*, 288 F. Supp. at 514.

*DuPonte* was cited approvingly in a Report and Recommendation on *Diaz v. Wall*, No. 17-cv-94 (D.R.I. Feb. 12, 2018), *report and recommendation accepted by* 2018 WL 1224457 (D.R.I. Mar. 8, 2018), which found a plausible Eighth Amendment violation, for purposes of a Motion to Dismiss, where the plaintiff alleged that conditions amounting to solitary confinement were "conditions [ ] imposed on him by prison officials who were aware that prolonged solitary confinement could be deleterious to mental health, aware of his diagnosed mental illness, and aware that the repeated imposition of segregation meant that Plaintiff was in solitary confinement for significant portions of each of his relatively short prison sentences." *Id*. at *7.

Most recently, in *Tefft v. Coyne-Fague*, this Court found that the plaintiff plausibly alleged an Eighth Amendment violation when he was sentenced to 25 months of disciplinary confinement, of which he served 13 months. 2021 WL 5824331, at *6 (D.R.I. Dec. 8, 2021). The Court determined, as in *DuPonte*, that a reasonable factfinder could conclude that the conditions

he lived under for more than a year violated the Eighth Amendment, and found plausible his allegations that Defendants acted with deliberate indifference.[15] *Id.*

Mr. Cintron was held for approximately 30 months in conditions virtually identical to those in which Mr. DuPonte, Mr. Diaz, and Mr. Tefft were confined. Like the other plaintiffs, Mr. Cintron listed as defendants the RIDOC Director and Assistant Director,[16] booking officers,[17] and wardens and deputy wardens of the facilities in which he was held.[18] In this case, Defendants Bibeault and Cabral threatened to put Mr. Cintron in solitary confinement for 365 days, knowing the effect it would have on him; Bibeault specifically threatened that Mr. Cintron might not be "normal" when he left segregation. ECF 38 at 8 ¶ 41. Defendant Diniz said he would personally make sure that Mr. Cintron got 365 days in segregation, and refused to suspend his disciplinary time. *Id.* at 8 ¶ 43. Defendant Kettle refused to overturn or mitigate the bookings on appeal. *Id.* at 10 ¶ 56; 15 ¶ 83. And when Mr. Cintron wrote to Defendants Coyne-Fague, Corry, and Aceto about his extended segregation sentence, they refused to waive, reduce, or suspend it. *Id.* at 9 ¶ 46; 15 ¶ 86, ¶ 88.[19]

---

[15] Defendants allege that no violation of the Eighth Amendment occurred in this case because Plaintiff "engaged in an organized effort to bring the lethal drug fentanyl into the ACI" and that "the seriousness of this offense cannot be overstated." ECF 38 at 29. By means of comparison, Mr. Tefft was accused of creating and conveying a weapon that was used to stab a correctional officer and in an attempted stabbing of a second officer.

[16] For Mr. Cintron, Defendants Coyne-Fague and Kettle. In Mr. Tefft's case, defendants Coyne-Fague and Kettle; in Mr. DuPonte's case, defendants Wall and Kettle; in Mr. Diaz's case, defendants Wall, Kettle, and Weeden.

[17] For Mr. Cintron, Defendants Bibeault and Cabral. In Mr. DuPonte's case, defendant Begones; in Mr. Tefft's case, defendant Forgue.

[18] For Mr. Cintron, Defendants Aceto, Corry, and Diniz. In Mr. Diaz's case, defendant Jankowski; in Mr. DuPonte's case, defendant Aceto; in Mr. Tefft's case, defendants Aceto and Moore.

[19] Defendants' Motion notes, in defense of their refusal to waive segregation time, that Plaintiff "admitted in his pleadings that upon being placed in disciplinary confinement, he continued to violate prison rules." ECF 50 at 40. Mr. Cintron's behavior while in disciplinary segregation does not negate the fact that he received an initial, cumulative series of sentences totaling 450 days in disciplinary segregation. Additionally, it is well-established that prisoners in solitary confinement are more likely to violate prison rules and exhibit angry and impulsive behavior. Defendants were on notice to this research through a presentation on January 5, 2017 to the Special Legislative Commission to Study and Assess the Use of

At this stage in litigation, the conditions under which Mr. Cintron was held plausibly state a claim for an Eighth Amendment violation and the pleadings support an inference of deliberate indifference.

Additionally, for the reasons stated in § IV(2)(A), *infra* at 18, the Prison Litigation Reform Act's physical injury requirement does not bar Plaintiff's Eighth Amendment claim.[20]

### B. *Plaintiff is Entitled to Relief*

Plaintiff's Second Amended Complaint sought injunctive and declaratory relief and damages for violation of his Eighth Amendment rights, in addition to "a preliminary and permanent injunction requiring removal of Plaintiff from disciplinary segregation and a reclassification to Medium Security; [a] preliminary and permanent injunction prohibiting Defendants from further retaliation against Plaintiff; [a]n award of compensatory, punitive, and nominal damages; [a]n award of costs and attorneys' fees arising out of this litigation; and [a]ny other relief this Court deems appropriate." ECF 38 at 18-21.

Defendants assert that Plaintiff's Eighth Amendment claim must be dismissed because he is not entitled to any relief. A claim is moot only if "no relief is available." *Kuperman v. Wrenn*, 645 F.3d 69, 73 (1st Cir. 2011), *quoting Church of Scientology v. United States*, 506 U.S. 9, 12 (1992).

First, Defendants argue that Plaintiff's damages claim against the Defendants in their individual capacities is barred by qualified immunity. ECF 50 at 35-43. However, even if

---

Solitary Confinement which described how solitary confinement causes anger, diminished impulse control, aggression, hyper-sensitivity to external stimuli, harmful behavior to self (substance use, self-harm) and harmful behavior to others (violence, rages, and threats). Presentation of Sarah Martino to the Commission (Jan. 5, 2017), https://ritv.devosvideo.com/show?video=1940bc14c638&apg=ed687894.

[20] Defendants raised their allegations vis-a-vis § 1997e(e) with regards to Counts 2 and 3 but note that "[t]he arguments based on the PLRA also apply to Plaintiff's other claims." ECF 50 at 23, n.9.

qualified immunity applies, Plaintiff would still be entitled to relief against Defendants in their official capacities.

Second, Defendants claim that Plaintiff's requests for injunctive relief are not viable. ECF 38 at 43-46. Plaintiff agrees that his request for removal from restrictive housing is now moot, as he is in the general population. That said, as a general matter, a request for a preliminary injunction prohibiting retaliation is not *per se* too broad under the PLRA. *See Gomez v. Vernon*, 255 F.3d 1118, 1130 (9th Cir. 2001) (injunction prohibiting prison officials from retaliating against plaintiffs based on litigation was narrowly drawn and did not "require the continuous supervision of the court" or "judicial interference in the running of the prison system"), *cited approvingly in Kane v. Winn*, 319 F. Supp. 2d 162, 186 n.35 (D. Mass. 2004). *See also Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 U.S. App. LEXIS 10263 (11th Cir. Apr. 15, 2022) (upholding district court injunction ordering a prisoner be released into general population housing as "narrowly tailored to the alleged constitutional violation").

In any event, the theoretical difficulty of crafting future injunctive relief is not an adequate justification to dismiss Plaintiff's case under the PLRA. *Williams v. Cutler*, No. 1:14-cv-539-NT, 2016 U.S. Dist. LEXIS 33801, at *22-24 (D. Me. Mar. 11, 2016) (holding that the motion to dismiss stage is too early to decide whether the PLRA's limitations on prospective relief provides a basis for dismissal of a claim and regardless, "picking off one type of relief requested—here, punitive damages—while other types of requested relief remain, does not show a failure to state a claim under Rule 12(b)(6)").

Finally, even if the Court were to foreclose compensatory damages and injunctive relief, Mr. Cintron may obtain nominal and punitive damages under § 1983. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (a request for nominal damages satisfies the

redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right); *Kuperman v. Wrenn*, 645 F.3d 69, 73 (1st Cir. 2011). Because some relief is available on Mr. Cintron's Eighth Amendment claim, it is not moot.

### 2. Count 2: First Amendment (Freedom of Speech)

Count 2 of Plaintiff's Second Amended Complaint alleges that Defendants Bibeault, Cabral, and Diniz retaliated against Mr. Cintron for exercising a constitutionally protected right, namely for refusing to serve as an informant, otherwise referred to as a "snitch."

As outlined in Plaintiff's Opposition to Defendants' Motion to Stay, a claim for retaliation based on constitutionally-protected action requires a plaintiff to prove that they 1) engaged in constitutionally protected conduct, 2) suffered an adverse action, and that 3) a causal connection existed between the constitutionally protected conduct and adverse action. ECF 47 at 6, *citing Price v. Wall*, 464 F. Supp. 2d 90, 96 (D.R.I. 2006).

Defendants allege that Plaintiff's complaint is deficient because it does not comply with the Prison Litigation Reform Act's physical injury and exhaustion requirements, that it is insufficiently pled as to the Defendants and claims, and that Plaintiff has pled sufficient facts that would warrant Defendants waiving qualified immunity.

### A. PLRA § 1997e(e) Does Not Bar Plaintiff's Claims

Defendants first assert that Plaintiff's claims do not comply with PLRA § 1997e(e), which they claim require Plaintiff to "allege a physical injury" prior to bringing claims. ECF 50 at 23-24. For this proposition, Defendants mischaracterize the relevant case law from other jurisdictions, citing seven cases from 2000-2003 that either solely foreclosed compensatory damages or have since been limited or overturned.[21] Defendants cite only one case from the First

---

[21] *Mitchell v. Horn*, 318 F.3d 523, 533 (3d Cir. 2003) ("regardless how we construe § 1997e(e)'s physical injury requirement, it will not affect Mitchell's ability to seek nominal or punitive damages for violations

Circuit, where the Court briefly acknowledged the presence of a "physical injury requirement" in the PLRA but declined to "address the defendants' contention" that it applied. *Ford v. Bender*, 768 F.3d 15, 22 (1st Cir. 2014).

As of April 2021, every circuit court now allows claims for punitive damages without a showing of physical injury in prison § 1983 cases. *See Hoever v. Marks*, 993 F.3d 1353, 1355-56 (11th Cir. 2021) ("Our circuit stands alone in enforcing § 1997e(e) as a complete bar to punitive damages, no matter the substantive claim, in the absence of physical injury. Because our interpretation runs counter to the text of the statute, today we correct our course. We now recognize that § 1997e(e) permits claims for punitive damages without a showing of physical injury."). In other words, there is no court where constitutional civil rights claims can be dismissed solely on the basis that a plaintiff did not allege physical injury.

In the First Circuit, a request for nominal and punitive damages is sufficient to overcome § 1997e(e)'s limitation for claims involving violations of a prisoner's constitutional rights. *Kuperman v. Wrenn*, 645 F.3d 69, 73 n.5 (1st Cir. 2011); *Harris v. Liberty*, No. 1:19-cv-00346-LEW, 2020 U.S. Dist. LEXIS 14707, at *19-21 (D. Me. Jan. 29, 2020). The First Circuit has not yet established whether § 1997e(e) precludes the award of compensatory damages without a

---

of his constitutional rights"); *Herman v. Holiday*, 238 F.3d 660, 666 (5th Cir. 2001) (compensatory damages not available under PLRA for emotional injuries; no discussion of nominal or punitive damages); *compare to Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 605-06 (5th Cir. 2008) ("Despite the limitations imposed by § 1997e(e), we have recognized that a prisoner can, absent a showing of physical injury, pursue punitive or nominal damages based upon a violation of his constitutional rights"); *Cassidy v. Ind. Dep't of Corr.*, 199 F.3d 374, 376-77 (7th Cir. 2000) (§ 1997e(e) limits relief available to prisoners if no physical injury is alleged, but does not bar lawsuit entirely). *See Myers v. Ind. Dep't of Corr.,* 655 F. App'x 500, 503 (7th Cir. 2016) (incorrect to state that, under 42 U.S.C. § 1997e(e), a prisoner must allege a physical injury in order to state a claim for mental or emotional injury); *Milledge v. McCall*, 43 F. App'x 196, 198 (10th Cir. 2002) (applying physical injury requirement to compensatory, not nominal damages); *see also Leek v. Androski*, No. 21-3165, 2022 U.S. App. LEXIS 10431, at *15 (10th Cir. Apr. 18, 2022) (PLRA does not restrict recovery of nominal or punitive damages when a prisoner establishes a constitutional violation); *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (subsequently overturned).

19

showing of physical injury. *Id.* Regardless, as Plaintiff seeks "an award of compensatory, punitive, and nominal damages," ECF 38 at 21, Defendants are not entitled to dismissal of any counts based on § 1997e(e).

### B. *Plaintiff is Not Required to Plead Exhaustion of Administrative Remedies*

Defendants note that Mr. Cintron "has not alleged that he exhausted administrative remedies or filed any grievances related to the alleged conduct by Defendants Bibeault, Cabral, and Diniz that is the subject of Counts 2 and 3." ECF 50 at 25. Prisoners are not required to specifically plead or demonstrate exhaustion in their complaints. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Rather, failure to exhaust under the PLRA is an affirmative defense and "must be raised and proved by the defense." *Cruz-Berríos v. González-Rosario*, 630 F.3d 7, 11 (1st Cir. 2010).

### C. *Plaintiff has Pled Sufficient Facts as to Defendants Bibeault, Cabral, and Diniz*

For the purposes of a motion under Fed. R. Civ. P. 12(c), Plaintiff has met each element of a constitutional retaliation claim, namely: 1) engaging in protected conduct, 2) suffering an adverse action, and 3) a causal connection between the protected conduct and adverse action.

#### 1. Plaintiff engaged in constitutionally protected conduct

The First Amendment protects a prisoner's refusal to act as a snitch for correctional officers in certain circumstances. *Burns v. Martuscello*, 890 F.3d 77, 89 (2d Cir. 2018). This principle arises from the "right not to speak." As articulated in *Burns* at 84-85:

> "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977). To force a person to speak, and compel participation, is a severe intrusion on the liberty and intellectual privacy of the individual. . . . In *Riley v. National Federation of the Blind of North Carolina, Inc.*, the Supreme Court explained, 'There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees "freedom of speech," a term necessarily comprising the decision of both what to say and

what *not* to say.' 487 U.S. 781, 796-97, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988). (emphasis in original).

The freedom from forced snitching specifically has a longstanding history in the United States; outrage regarding compelled assistance to the British was a major cause of the American Revolution, and as Justice Gorsuch recounted during oral argument in *Carpenter v. United States,* "such practices ignited the fury of the colonists largely because they forced individuals to serve as "snitches and snoops" for the Crown." *Burns*, 890 F.3d at 90. The use of general warrants and the writs of assistance subsequently provided the foundation for the Fourth Amendment. *Id.*

Nowadays, it is well established that individuals generally have a right not to answer questions posed by police. *Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (a person approached by police "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way").[22] Accordingly, the recognition by the Second Circuit in *Burns* of a right not to snitch "fits well within a broader frame of constitutional protection from the government's ability to compel participation in investigative measures" and from providing false statements to the government. *Id.* at 86, 91. The court did not decide whether prisoners have a right "to refuse to give truthful information about a past event, or in an emergency." *Id.* at 93.

This Court should adopt and extend the Second Circuit's thoughtful analysis of First and Fourth Amendment jurisprudence to find that compelled snitching in prison violates the First Amendment. In Plaintiff's case, it should find that Mr. Cintron had a right to refuse to provide information about how an illegal narcotic entered the prison.

---

[22] Although the state has the power to subpoena witnesses in legal proceedings, the prison context is distinct because a subpoenaed, nonincarcerated witness "enjoys protections utterly unattainable for the inmate," including the right to contest the subpoena, and a court may quash or limit its scope if it is overbroad or otherwise abusive of an individual's rights and privileges. *Burns*, 890 F.3d at 92.

2.  Plaintiff suffered an adverse action

Retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. *Lyons v. Wall*, 464 F. Supp. 2d 79, 83 (D.R.I. 2006).

In his Opposition to Defendants' Motion to Stay, Plaintiff clarified that the "adverse action" in his First and Fifth Amendment claims (Counts 2 and 3) was the "'issuance of a [disciplinary] booking[, which] is a prehearing action,' ECF 38, ¶ 104, as opposed to a disciplinary hearing, conviction, or sanction. Plaintiff did not and does not challenge in this proceeding the validity of the guilty verdict or sanction resulting from the booking, as such a claim would be *Heck*-barred." ECF 47 at 7. Defendants read this to mean that Mr. Cintron "disclaimed that the actual sanction he received forms the basis for these First and Fifth Amendment claims." ECF 50 at 26.

Plaintiff's formulation appears to have inadvertently caused confusion. In disclaiming a challenge in this proceeding to the validity of the guilty verdict or validity of the sanction, Mr. Cintron was attempting to clarify two matters: One, that the "adverse action" was the issuance of a booking, rather than the guilty verdict itself, since Defendants Bibeault, Cabral, and Diniz were not the hearing officers and did not adjudicate the booking. Two, that Mr. Cintron is not challenging the *validity* of the sanction, i.e. whether a sanction was presumptively *invalid* based on the evidence submitted to the hearing officer.[23]

---

[23] As Mr. Cintron made clear in his Opposition to Defendants' Motion to Stay, he does challenge the proportionality of the sanction as implemented and the conditions under which he was confined subsequent to his overdose, bookings, and reclassification. ECF 47 at 7.

The issuance of a booking for trafficking, which carries up to 365 days in disciplinary confinement and a reasonable expectation that the hearing officer will find a prisoner guilty, constitutes an "adverse action" for retaliation purposes.

3.  There existed a causal connection between the constitutionally protected conduct and adverse action

To prevail on these claims, Plaintiff must demonstrate a causal connection between the constitutionally-protected conduct and the adverse action. Proving that Defendants undertook a discretionary action (filing a disciplinary booking) because of, and in retaliation for, Plaintiff's protected conduct (refusing to cooperate with an investigation) is an analysis that turns on a Defendant's state of mind, not probable cause. *Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990); *McDonald v. Hall*, 610 F.2d. 16 (1st Cir. 1979).

Causal connection can be inferred through circumstantial evidence, which "is often enough to support a claim that an adverse action was taken with retaliatory intent, as intentions are often difficult to prove through direct evidence." *Donlon v. O'Mara*, 2011 WL 1230531, at *8 (D.N.H. Feb. 4, 2011), r*eport and recommendation approved by Donlon v. Hillsborough Cnty. Dep't of Corr.*, 2011 WL 1193645 (D.N.H. Mar. 28, 2011). Direct proof of a retaliatory motive is not essential to make out a prima facie case of retaliation in the prison context and "[i]n some instances, circumstantial evidence (say, temporal proximity between a protected act and an adverse action, falsification of institutional records, or deviation from standard operating procedures) may suffice." *Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011). *See also Beauchamp v. Murphy*, 37 F.3d 700, 711 (1st Cir. 1994); *Ferranti v. Moran*, 618 F.2d 888, 892 (1st Cir. 1980) (chronology of events provided support for inference of retaliation); *McDonald*, 610 F.2d at 18 (same).

As Mr. Cintron noted in his Opposition to Defendants' Motion to Stay, disciplinary bookings are subject to the same analysis as other actions that are fully discretionary on the part of a department of corrections, unless done for retaliatory motive. *Price*, 464 F. Supp. 2d at 96 ("Actions, which standing alone do not violate the constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.") (citing *Thaddeus–X v. Blatter*, 175 F.3d 378, 386 (6th Cir.1999) (en banc)); *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) ("An act in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper."); *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979) (a prisoner can be transferred for any reason except in retaliation for exercise of constitutionally protected right).

In a range of analogous cases, the First Circuit has repeatedly stated or implied that a "reasonable inference of retaliatory animus" would be sufficient to overcome summary judgment, even in instances where Defendants contend they had—or could have had—a legitimate purpose for taking adverse action. *See Turner v. Wall*, No. 18-1869, 2020 U.S. App. LEXIS 30047, at *9 (1st Cir. May 5, 2020) (affirming summary judgment because "Defendants provided legitimate non-retaliatory justifications for each of the classification decisions . . . and [Plaintiff] failed to produce any countervailing evidence linking those decisions to his protected activity."); *Hannon v. Beard*, 645 F.3d 45, 50-51 (1st Cir. 2011) (plaintiff did not allege sufficient evidence to contradict the defendant's stated (non-retaliatory) reason for an adverse action); *L'Heureux v. Ashton*, No. 98-1336, 1998 U.S. App. LEXIS 25790, at *3-4 (1st Cir. Oct. 13, 1998) ("Defendants' conduct in disciplining plaintiff, even if not unconstitutional, still might

have been actionable if it was done in retaliation for plaintiff's exercise of constitutionally protected rights.").

Plaintiff has pled sufficient facts to prevail on a Motion under Rule 12(c) as to Defendants Bibeault, Cabral, and Diniz. Defendants Bibeault and Cabral "together interrogated Mr. Cintron about how the pill had entered the facility" and "threatened to put Mr. Cintron in disciplinary segregation for a year if he refused to cooperate" with their investigation. ECF 38 at 8. Bibeault then told Mr. Cintron that he would write him a booking for trafficking because Mr. Cintron was "being a hard-ass." *Id.* When Mr. Cintron told Defendant Diniz about his conversation with Defendants Bibeault and Cabral, Defendant Diniz told Plaintiff that he would personally make sure that he got 365 days in disciplinary segregation. *Id.*

 Even if they believed that Mr. Cintron was involved in smuggling, such an infraction would have carried 10-30 days in segregation, not the 365 days that they threatened Mr. Cintron with.

In this case, Plaintiff has met his burden under Rule 12(c). Plaintiff engaged in constitutionally protected conduct—namely, refusing to cooperate with an investigation. He suffered an adverse action when he was booked for narcotics trafficking in spite of the availability of a lower charge supported by greater evidence. Finally, Defendants' own

---

[24] ██████████████████████████████████████████████████████
████████████████████████████████████████████

statements support a causal connection between Mr. Cintron's refusal to cooperate and the booking.

### D. Qualified Immunity is an Affirmative Defense

Defendants assert that "Plaintiff has also failed to plead any facts that would warrant waiving these Defendants' qualified immunity." ECF 50 at 27. Qualified immunity is an affirmative defense, and the "burden of pleading it rests with the defendant." *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664, 667 (1st Cir. 1996), *quoting Gomez*, 446 U.S. 635, 640 (1980). As described in § IV(1)(B), *supra* at 16-18, even if the Court were to find that Defendants were immune from damages in their individual capacities, the claim would not be moot due to the viability of non-compensatory relief.

### E. Defendants' Allegations that Plaintiff is Engaging in Frivolous Litigation are Meritless

In their Motion on Counts 2 and 3, Defendants state that "[t]he brashness of Plaintiff's course of conduct is stunning" and that "Plaintiff's allegations are frivolous and an affront to Defendants' efforts to protect the inmate population and keep dangerous drugs from entering the facility." ECF 50 at 27-28. Mr. Cintron spent 2.5 years in solitary confinement as a result of Defendants' action and inaction, and suffered greatly as a result. His overdose and subsequent plea of *nolo contendere* to a charge of narcotics conveyance do not obviate Defendants' constitutional duties to refrain from retaliation on the basis of constitutionally protected conduct.

### 3. Count 6: Abuse of Process

Count 6 of Plaintiff's Second Amended Complaint asserts that Defendant Bibeault abused the state criminal justice process by initiating criminal legal proceedings against Plaintiff in retaliation for Mr. Cintron advancing litigation against him, and that the initiation of criminal charges was an ulterior or wrongful use of the criminal process. ECF 38 at 20. This Count is based on Defendant Bibeault's actions subsequent to Plaintiff's filing of an amended complaint

on July 21, 2020. Specifically, Plaintiff alleged that Defendant Bibeault suspended, paused, or completed his trafficking investigation in or shortly after August 2019, and that he resumed or restarted his trafficking investigation in or around September 2020, only after Plaintiff filed an amended complaint with the assistance of appointed counsel. *Id.* at 16-18.

"Abuse of process . . . arises when a legal proceeding, although set in motion in proper form, becomes perverted to accomplish an ulterior or a wrongful purpose for which it was not designed." *Hillside Assocs. v. Stravato*, 642 A.2d 664, 667 (R.I. 1994). "The gravamen of that tort is not the wrongfulness of the prosecution, but some extortionate perversion of lawfully initiated process to illegitimate ends." *Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994).

A. *Defendant Bibeault Set in Motion the Criminal Charges*

Defendants' Motion argues that the abuse of process claim must be dismissed on the grounds that Plaintiff did not plead or suggest that Defendant Bibeault "caused the initiation of the criminal charges and/or violation report" or "had any communications at all with the prosecuting entity." ECF 50 at 14. The Defendants have not met their burden for judgment on the pleadings, which is only appropriate when "it appears beyond a doubt that the nonmoving party can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Rezende v. Ocwen Loan Servicing, LLC*, 869 F.3d 40, 42 (1st Cir. 2017), *quoting Feliciano v. Rhode Island*, 160 F.3d 780, 782 (1st Cir. 1998). If, based on deposition evidence, Plaintiff establishes that Defendant Bibeault in fact reinvigorated the criminal process against Mr. Cintron to quash his vigorous pursuit of the Amended Complaint, then the abuse of process claim may proceed. Therefore, at this stage the standard for judgment on the pleadings is not met.

Plaintiff's Second Amended Complaint alleges that Defendant Bibeault "resumed or restarted his trafficking investigation in or around September 2020" and that the Criminal Complaint was filed against Mr. Cintron "per allegations that Defendant Bibeault had made

against him." ECF 38 at 16, 18. This assertion was based on a statement attributed to Defendant Bibeault in the criminal Information that he forwarded his investigatory materials to Tilson for possible state charges. ECF 50-1 at 59.

Information obtained subsequent to the filing of the Complaint supports Plaintiff's assertions and can be considered in the context of this Motion. *Rios-Campbell v. United States DOC,* 927 F.3d 21, 26 (1st Cir. 2019) ("[G]oing through a lengthy period of discovery only to ignore the fruits of the discovery process by focusing single-mindedly on the adequacy of the allegations of the complaint would make little sense in the mine-run of cases.").

As mentioned previously, Defendants have produced only 21 pages of records otherwise unavailable to Plaintiff regarding the investigation into Plaintiff's overdose that resulted in disciplinary action and subsequent state charges. However, the records that have been produced corroborate Defendant Bibeault's role as the primary instigator of criminal charges. ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ In fact, the only explicit mention of Cpl. Tilson's involvement in preparing the criminal complaint involves accompanying Defendant Bibeault to two interviews (on September 8, 2020 with Craig Kelly and on September 10, 2020 with Destiny Valley), accompanying another detective who conducted a photographic line-up with Destiny Valley on December 2, 2020, *Id*. at 24-26, 46, and requesting a criminal records check on Plaintiff. *Id*. at 94-115.

During the interviews that Cpl. Tilson attended with Craig Kelly and Destiny Valley, Defendant Bibeault appears to have taken the lead in questioning regarding Mr. Cintron. Per the Information, during the second interview with Destiny Valley on September 10, 2022, Defendant Bibeault took over the interrogation to ask a series of leading questions about Mr. Cintron:

| | |
|---|---|
| Bibeault: | Did Davante ever, like, say a nickname of like, King Kong or something like that? |
| Valley: | I heard Kong before. |
| Bibeault: | Kong is — That's Jerry Cintron. That — that's the guy who set this whole thing up. So. |
| Valley: | Yeah, I heard his name just one time. |
| Bibeault: | Okay. And how was that in conversation, how hear you get that? [sic] |
| Valley: | He just said he had to do a favor for his brother Kong. |
| Bibeault: | Okay. I know they were tight on the — |
| Valley: | Yeah. |
| Bibeault: | — outside so. Yup. Yup. |
| Tilson: | So, you'd never met him before though? |
| Valley: | No. |
| Tilson: | Okay. All right. |

*Id.* at 42.[25]

Further, according to a letter purporting to be from Craig Kelly, obtained by Plaintiff in November 2021 and shared with Defendants in discovery as an unauthenticated record, Defendant Bibeault "falsified a police report by using my name in his report saying that I made verbal statements to him about Mr. Cintron. I never said anything about Mr. Cintron, to the investigator or the state police … And about a year after this took place; Investigator Bibeault, and a[n] African American state troop. came to Maximum Security and began to ba[d]ger me to write a statement, telling me that if I don't cooperate they would charge me as well … 'I said I have nothing to stay still.' Bibeault, got mad … Its very clear Bibeault, was set on going after Mr. Cintron, and has falsified a State police report to do it." [sic] Exh. D.[26]

For the purposes of an abuse of process claim, the judicial proceeding may be "initiated" by defendants who "knowingly provid[ed] the RISP [Rhode Island State Police] and Rhode Island Attorney General with false and misleading information to induce the subsequent

---

[25] The criminal Information summarizes this interaction as "Ms. Valley recalled that Neves stated that he had to do a favor for his brother, "Kong", and requested her help." ECF 50-1 at 24.

[26] As noted previously, this document has not been authenticated by its purported author. Prior to the Stay being entered in this case, Plaintiff intended to seek leave of the court to depose Mr. Kelly under Fed. R. Civ. P. 30(a)(2)(B).

prosecution of Plaintiff." *Miller v. Metro. Prop. & Cas. Ins,*, No. 06-3336, 2010 R.I. Super. LEXIS 137, at *57 (Super. Ct. Sep. 7, 2010) (genuine issue of material fact as to whether Defendants initiated criminal proceedings "or the process behind the criminal proceedings" with the State Police, or if the State Police had previously initiated such a process). *See also Hoffman v. Metcalf,* 851 A.2d 1083, 1090 (R.I. 2004) (no abuse of process by civilian who "set in motion" criminal prosecution by reporting conduct to the police, because reporting was done in good faith and with "sufficient grounds").

As outlined on page 9, *supra*, Defendants have produced almost no records related to the investigation. Nonetheless, it is clear that Defendant Bibeault did "set in motion" the judicial process that led to Mr. Cintron's criminal charges when he forwarded a packet of investigatory materials to the State Police. ECF 50-1 at 59. Further discovery is necessary to determine the extent to which Defendant Bibeault was entangled in or indeed the driving force behind the arrest and criminal prosecution.

Defendants also note that the Second Amended Complaint "does not identify any way in which the amended complaint against Investigator Bibeault was materially different from the complaint Plaintiff filed against Defendant Bibeault in September 2019 initiating this lawsuit." *Id*. at 15. However, the threat of litigation through appointed counsel presents a materially different circumstance than *pro se* litigation.[27]

---

[27] Between 2000 and 2019, 91 percent of prisoner petitions in federal District Court were filed by *pro se* plaintiffs. *Just the Facts: Trends in Pro Se Litigation from 2000 to 2019,* U.S. COURTS, Feb. 11, 2021, https://www.uscourts.gov/news/2021/02/11/just-facts-trends-pro-se-civil-litigation-2000-2019. It is well known that *pro se* plaintiffs, compared to represented litigants, face higher rates of termination by pretrial adjudication, higher rates of dismissals, and lower rates of settlement. Mark D. Gough & Emily S. Taylor Poppe, *(Un)Changing Rates of Pro Se Litigation in Federal Court*, 45 Law & Social Inquiry 567–589 (2020). With regards to this instant litigation, Defendants filed a Motion to Dismiss three weeks after accepting service of Plaintiff's *pro se* complaint. Their Motion was pending when pro bono counsel were appointed on March 20, 2020. Plaintiff's counsel filed an amended complaint on July 21, 2020 and on

### B. The Criminal Proceedings were Used for an Ulterior or Wrongful Purpose

Defendants aver that Plaintiff has failed to meet the second prong of an abuse of process claim, that the criminal proceedings were used "for an ulterior or wrongful purpose that the proceedings were not designed to accomplish," since under Rhode Island law, spite and malice alone are inadequate to establish abuse of process. ECF 50 at 15.

Malice and/or spite alone are insufficient to establish the "ulterior motive" prong where proceedings are intended to accomplish the result for which they were created; however, targeted retaliation and harassment may meet this bar. For example, in *Heal v. Heal*, the Rhode Island Supreme Court found abuse of process by a husband who instituted an action for custody of his children, in whom he had shown little interest, solely in order "to make good on his threat to make [his wife's] life a living hell." 762 A.2d 463, 465 (R.I. 2000), *as quoted in Wright v. Zielinski*, 824 A.2d 494, 499 (R.I. 2003). Similarly, in *De Leo v. Anthony A. Nunes, Inc.*, the state Supreme Court found abuse of process where a contractor "harrass[ed]" another builder with legal process as part of a comprehensive, malicious effort to derail a parcel's development. 546 A.2d 1344, 1347 (R.I. 1988). *See also Miller v. Metro. Prop. & Cas. Ins.,* No. 06-3336, 2010 R.I. Super. LEXIS 137, at *61 (Super. Ct. Sep. 7, 2010) (denying summary judgment on abuse of process claim where plaintiff alleged he "became a target" of the insurance industry "due to his efforts to accomplish reform" in that industry); *Brough v. Foley*, 572 A.2d 63, 65 (R.I. 1990) (reversing and remanding dismissal of an abuse of process claim, where sole allegation was that the legal action was "interposed merely for purposes of delay and harassment").

In *Gallipeau v. Baer*, this Court found that an abuse of process claim had been adequately pled by a party who alleged that the Plaintiff instituted a civil action for the "ulterior motive of

---

October 21, 2020, Defendants filed an Answer. Per information available to Plaintiff, Defendant Bibeault's investigation was resumed after the filing of Plaintiff's complaint through counsel.

retaliating against Defendant," where the Plaintiff brought a civil action "without basis and upon knowingly false allegations" and "motivated solely by malice." 2004 U.S. Dist. LEXIS 15848, at *8-9 (D.R.I. Feb. 26, 2004), *report and recommendation accepted by* No. CA 03-152ML (D.R.I. Mar. 30, 2004). Rhode Island courts have similarly drawn a distinction between actions motivated by a "pure spite motive," *Palazzo v. Alves*, 944 A.2d 144, 154 (R.I. 2008), and motive that extends "beyond mere spite," such as to unduly influence other proceedings. *Paiva v. Paiva*, 2008 R.I. Super. LEXIS 48, at *38-39 (Super. Ct. Apr. 10, 2008).

Investigators with RIDOC's Special Investigations Unit (SIU), such as Defendant Bibeault, are "responsible for monitoring and investigating any illegal or illicit inmate activity inside the Adult Correctional Institutions (ACI) which might compromise inmate safety, as well as staff or public welfare." Exhibit E at 2.[28] To do this, they "cultivate internal intelligence networks of confidential informants to gather information on dangerous or illegal activities" and interview "inmates, visitors, and staff" to uncover potential unlawful activity by prisoners. Id. at 4.[29] In order to perform their job duties, SIU officers must convince prisoners to "snitch" on others, through a mix of coercion and rewards.

"Snitching" is highly stigmatized, and prisoners labeled as "snitches" are at the bottom of the prison social hierarchy. Avoiding snitching is "the most sacred rule of the inmate code." David C. Pyrooz, et al., *Look Who's Talking: The Snitching Paradox in a Representative Sample of Prisoners,* 61 Brit. J. Criminol. 887 (2021), at 890. It is widely recognized that "an inmate who is considered to be a snitch is in danger of being assaulted or killed by other inmates."

---

[28] Rhode Island Department of Corrections, "Investigations & Intelligence." https://doc.ri.gov/about/investigations-intelligence
[29] State of Rhode Island, Division of Human Resources, Job Specifications: "Correctional Officer Investigator I." http://www.hr.ri.gov/documents/jobs/CORRECTIONAL%20OFFICER%20INVESTIGATOR%20I.PDF

*Flores v. Wall*, No. CA 11-69 M, 2012 U.S. Dist. LEXIS 136668, at *42 (D.R.I. Aug. 31, 2012),

*quoting Irving v. Dormiree* 519 F.3d 441, 450 (8th Cir. 2008). As the Second Circuit noted in

*Burns v. Martuscello*, 890 F. 3d 77, 91 (2d Cir. 2018):

> We also must emphasize the extreme risk that attends the act of snitching in the prison context. . . . It is a sobering and deplorable fact that violence occurs with regularity in far too many of our nation's correctional institutions. It is also well understood that inmates known to be snitches are widely reviled within the correctional system. . . . If a prison snitch is found out, then the inmate's forced service as an informant may well prompt life-threatening physical harm. And even if the informant is never unmasked, she must shoulder the burden of the knowledge that, if her status as a snitch ever does come to light, violence may well befall her.

By definition, "prisons are, to some degree, coercive organizations," and "the underlying

threat of coercion is ever-present in a prison environment." John Wooldredge & Benjamin

Steiner, *The Exercise of Power in Prison Organizations and Implications for Legitimacy,* 106 J.

Crim. L. & Criminology (2016), at 125. It is also a setting where, due to the daily interaction

between prisoners and officers, "consent and the cultivation of legitimacy involve ongoing

relationships between authorities and their subjects." *Id*. Sociological research has emphasized

that officer legitimacy is typically earned through use of expert, referent, and positional power.

*Id.* at 163. However, coercive power is "'probably the only effective power when [an]

organization is confronted with highly alienated' participants with little commitment to the goals

of the organization," *Id*. at 133, and when "subjects are unwilling to comply otherwise." *Id*. at

134. For these reasons, officers working with higher custody levels are more likely to rely on

coercive power to gain compliance. *Id.* at 139, 156. In the context of snitching, coercion is

therefore sometimes used for intelligence-gathering under threat of penal consequences. Pyrooz,

et al., *supra*, at 6. Displays of dominance and control by correctional staff can also be used to

gain prestige, establish legitimacy, and cultivate respect among fellow officers. Kelsey

Kauffman, Prison Officers and Their World, 152, 156 (Harvard University Press 1988).

33

Just as snitching in prison is meaningfully different from snitching to the police, Pyrooz, et al. *supra*, at 3-4, 17, retaliation in the prison context serves distinct functions due to the carceral environment and realities of institutional life. One motive may be targeted harassment, as was the case in *Heal v. Heal*. An officer might also issue a disciplinary sanction against a prisoner who files a grievance against him to deter future complaints from that prisoner and others. *See Reynolds-Bey v. Harris-Spicer*, 428 F. App'x 493, 503 (6th Cir. 2011) (threatening a prisoner with disciplinary sanctions in retaliation for engaging in constitutionally protected activity may deter a "person of ordinary firmness" from exercising that right).

Similarly, a prison investigator who seeks to establish his authority over prisoners can deploy the threat of retaliation and state charges to coerce other prisoners' cooperation with investigators in an environment where snitching is highly stigmatized. This motive is on display in Plaintiff's Second Amended Complaint, ECF 38 at 8 (Bibeault threatened to put Mr. Cintron in disciplinary segregation for a year if he refused to cooperate with his investigation), and in Exh. D, where the author states that Bibeault "called me down to the hospital and began to ba[d]ger me to write a statement, telling me that if I don't cooperate they would charge me as well." As a result, the act of retaliating against prisoners who challenge an investigator's authority can induce or compel cooperation among others—a collateral advantage of the retaliatory act.

In asserting that the initiation of criminal charges was retaliatory, Plaintiff pled adequate facts to meet his burden under Rule 12(c), and the Court should deny Defendants' motion as to this count. *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 326 (D.R.I. 2017) ("Plaintiffs must plead facts sufficient 'to raise a reasonable expectation that discovery will reveal evidence'" in support of their claims) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

### 4. Count 7: First Amendment (Access to Courts)

The final count of Mr. Cintron's Second Amended Complaint asserts that Defendant Bibeault violated Plaintiff's right to petition the courts for redress of grievances by initiating criminal charges against Plaintiff in retaliation for advancing litigation against him. ECF 38 at 20-21.

The First Amendment shields prisoners from being retaliated against for engaging in protected speech, including petitioning the government for redress of grievances. *Ortiz v. Jordan*, 562 U.S. 180, 190-191 (2011). This protection includes ensuring "access of prisoners to the courts for the purpose of presenting their complaints." *Rhodes v. Chapman*, 452 U.S. 337, 362 n.9 (1981). Accordingly, prisons may not retaliate against a prisoner for exercising her or his right to petition the government through civil legal proceedings. *Price*, 464 F. Supp. 2d at 96.

To prevail on a claim of retaliation against a prisoner for exercising his constitutional rights, the prisoner must prove that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) there was a causal connection between the constitutionally protected conduct and the adverse action, so that it can be said that the constitutionally protected conduct was a motivating factor for the adverse action." *Id*. at 55. Once a prisoner has established a prima facie case, the burden shifts to the defendant to prove by a preponderance of the evidence that he "would have reached the same decision [] even in the absence of the protected conduct." *Donlon*, 2011 WL 1230531, at *8.

Mr. Cintron contends that his constitutional rights were violated in precisely this manner. Specifically, he argues that Defendant Bibeault, in response to Plaintiff advancing litigation against him as lead defendant, retaliated against Plaintiff by initiating criminal charges against him. In their Motion, Defendants counter that Plaintiff fails to meet the second and third elements of a retaliation claim, due to several alleged defects in his Second Amended Complaint.

A. *Lack of Probable Cause is Not a Necessary Element of Plaintiff's Claim*

Defendants characterize Mr. Cintron's claim as one of retaliatory prosecution based on speech, thereby inserting a "no probable cause" requirement for his claim to be successful. ECF 50 at 10-11. *See Hartman v. Moore*, 547 U.S. 250, 262-66 (2006). As Mr. Cintron explained in his Opposition to Defendants' Motion to Stay, "*Hartman* established that lack of probable cause was a necessary element of an action under the First Amendment for retaliatory prosecution or retaliatory inducement to prosecute based on speech." ECF 47 at 10. However, *Hartman* does not provide the correct standard in this case, as the "adverse action" pled in Plaintiff's complaint is a retaliatory arrest, rather than a retaliatory prosecution or inducement to prosecute. As such, his claim should be considered under the standard prescribed in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), in which the Supreme Court narrowed *Hartman*'s holding in the context of certain retaliatory arrests.

The plaintiff in *Hartman* alleged that he was investigated by United States Postal Service inspectors in retaliation for engaging in protected speech—namely, for lobbying the Postal Service to adopt a technology that his company manufactured—and that the inspectors pressured the United States Attorney's Office to have him indicted. The Supreme Court established that a plaintiff alleging "that prosecution was induced by an official bent on retaliation" must plead absence of probable cause for the prosecution. *Hartman*, 547 U.S. at 265. The Court based its ruling in part on the "added legal obstacle in the longstanding presumption of regularity accorded to prosecutorial decisionmaking" and prosecutors' absolute immunity from liability for their charging decisions. *Id*. at 1705.[30]

---

[30] "[T]his presumption that a prosecutor has legitimate grounds for the action he takes is one we do not lightly discard, given our position that judicial intrusion into executive discretion of such high order should be minimal." *Hartman*, 547 U.S. at 1706, *citing Wayte v. United States*, 470 U. S. 598, 607-608 (1985).

Plaintiff's Amended Complaint was filed in September 2020. On October 7, 2020, the

Rhode Island State Police filed a criminal complaint on four felony charges in District Court.

Exh A. Plaintiff filed a proposed Second Amended Complaint on February 11, 2021, and the

Attorney General's Office filed a criminal Information in Superior Court on March 9, 2021.[31]

Plaintiff does not dispute that *Hartman* applies to the Attorney General's decision to

prosecute him, per the Information filed on March 9, 2021. But at the time that Plaintiff filed his

Second Amended Complaint alleging a violation of his First Amendment right to petition the

court, the sole charging action was a criminal complaint filed by the State Police. Thus, the

proper analogue is *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019), which applied *Hartman*'s

decision to retaliatory arrests.

In *Nieves*, the Supreme Court concluded that the "no-probable-cause requirement" should

not apply in circumstances where "officers have probable cause to make arrests, but typically

exercise their discretion not to do so," such as "when a plaintiff presents objective evidence that

he was arrested when otherwise similarly situated individuals not engaged in the same sort of

protected speech had not been." 139 S. Ct. at 1727. The Court cited *United States v. Armstrong*,

517 U.S. 456, 465 (1996), to guide the standard for evaluating evidence of retaliation, which

"expressly left open the possibility that other kinds of evidence, such as admissions, might be

enough to allow a claim to proceed." *Id.* at 1734 (Gorsuch, J., concurring in part). As Justice

Gorsuch explained in his concurrence, "[t]he point of *this* kind of claim isn't to guard against

officers who *lack* lawful authority to make an arrest. Rather, it's to guard against officers who

---

[31] In Rhode Island, a criminal prosecution for non-capital felony charges is initiated through the filing of a criminal complaint in District Court, which can be certified by a law enforcement agency. R.I. Super. Ct. R. Crim. P. 3. A criminal complaint, like an arrest, does not require any action from or coordination with the Attorney General's office. If the Attorney General's office decides to prosecute the charges, a prosecutor may file an Information, which moves the criminal case to Superior Court. If the Attorney General declines to prosecute the charges, the criminal case is dismissed. R.I. Super. Ct. R. Crim. P. 7.

*abuse* their authority by making an otherwise lawful arrest for an unconstitutional *reason*." *Id.* at 1731 (emphasis in original).[32]

This characterization matches the progression of Plaintiff's suit and Plaintiff's pleadings in his Second Amended Complaint—namely, the retaliatory bringing of criminal charges by a police officer.[33]

### B. *Plaintiff Experienced Disparate Treatment vis-a-vis Similarly Situated Individuals*

Under the appropriate test, should Plaintiff present "evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," his claim should proceed as though he "has met the threshold showing of the absence of probable cause." *Nieves*, 139 S. Ct. at 1727.

Defendant Bibeault and the State Police, to Plaintiff's knowledge, charged only Plaintiff for conveyance, despite even stronger evidence of culpability among other individuals, including Rafael Ferrer, who procured narcotics, gave them to Destiny Valley, and drove her to the DOC; and Destiny Valley, who brought narcotics into the ACI and handed them to her boyfriend, Davante Neves. Additionally, there is no indication in the record that Defendant Bibeault or the State Police pursued charges against any individual(s) responsible for conveying into the ACI the pill that Mr. Cintron overdosed on, which "very well could have killed him or another inmate." ECF 50 at 46.

---

[32] It is worth noting that in both *Hartman* and *Nieves*, plaintiffs' claims concerned retaliation for the First Amendment right to speech, whereas Mr. Cintron alleges retaliation for exercising his First Amendment right to petition the government for redress of grievances. The Supreme Court has emphasized this distinction, holding that the right to petition the government for redress of grievances is "one of the most precious of the liberties safeguarded by the Bill of Rights," *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954-55 (2018) (quoting *BE&K Constr. Co. v. NLRB*, 122 S. Ct. 2390 (2002)), and is "high in the hierarchy of First Amendment values." *Id*. at 1955 (finding probable cause was not complete bar to petitioner's retaliation claims in case premised on retaliatory municipal policy).

[33] As described in Exhibit E, SIU Investigators like Defendant Bibeault do not directly bring criminal charges but instead "assist other law enforcement agencies" to develop criminal and civil cases.

Plaintiff can plead adequate facts to meet the low threshold for surviving a motion under Fed. R. Civ. P. 12(c), *Feliciano*, 160 F.3d at 782,[34] and should be allowed to proceed in order to further develop the record in discovery.[35]

### C. Plaintiff has Alleged Sufficient "Adverse Action" by Defendant Bibeault

In their Motion, Defendants argue that Plaintiff's claim fails to satisfy the second element of a retaliation claim: that he suffered an adverse action. They contend that "Plaintiff does not plead any facts" connecting Defendant Bibeault to the criminal charges brought against Plaintiff, or "even inferring" that Defendant Bibeault took investigative actions because of the lawsuit. ECF 50 at 11-12. As described in on page 28, *infra*, available records suggest that Defendant Bibeault, not Cpl. Tilson, was the primary author of the violation report that accompanied the simultaneous filing of criminal charges and that would later form the basis of the criminal Information.

Plaintiff has alleged multiple facts demonstrating that Defendant Bibeault took adverse action against Plaintiff after Plaintiff filed his Amended Complaint. By alleging this set of facts in support of his claim, he has more than met the low threshold for surviving a motion under Fed. R. Civ. P. 12(c). *Feliciano*, 160 F.3d at 782. The extent of Defendant Bibeault's involvement in the initiation of criminal charges against Plaintiff remains a genuine issue of material fact, making it inappropriate for summary judgment. *Tolan*, 572 U.S. at 656. Additional discovery is needed to better understand the course of Defendant Bibeault's resumed investigation against

---

[34] To the extent that an amendment to Plaintiff's complaint would be necessary under Fed. R. Civ. P. 12(c), Plaintiff requests leave of court to do so. *See* discussion in § V, page 42.

[35] Plaintiff's outstanding discovery requests are aimed at discerning the role that Defendant Bibeault played in the bringing of criminal charges and his motivation in doing so. As described on page 28, *infra*, the sole actions that Cpl. Tilson appears to have done in furtherance of criminal charges independent of Defendant Bibeault were attending a witness line-up of Destiny Valley conducted by another officer and requesting a background check of Mr. Cintron.

Plaintiff, including how it was conducted and its role in ultimately inducing Cpl. Tilson to file his District Court complaint against Plaintiff.

*D. Plaintiff's Complaint Satisfies the "Motivating Factor" Element of His Retaliation Claim*

In their Motion, Defendants also argue that Plaintiff failed to satisfy the third element of a successful retaliation claim, which requires showing that Plaintiff's "constitutionally protected conduct was a 'substantial' or 'motivating factor' in the prison official's decision." *McDonald*, 610 F.2d at 18. Specifically, they argue that "Plaintiff does not plead any facts demonstrating, or even inferring, that Investigator Bibeault took investigative actions in September 2020 because of this lawsuit, especially when Plaintiff engaged in the asserted protected conduct." ECF 50 at 11-12. In doing so, they rely on a heightened standard of causation for demonstrating retaliation, beyond the law as traditionally applied in the First Circuit.

Defendants argue against a finding of retaliatory motivation by citing *Price v. Wall*, 464 F. Supp. 2d 90, 96 (D.R.I. 2006). There, Magistrate Judge Hagopian declared that a plaintiff "must demonstrate that the retaliatory act would not have occurred 'but for' the protected conduct," and that "even if the defendant had an impermissible reason for the alleged adverse action, if a separate, permissible reasons exists, the defendant will not be liable." *Price*, 464 F. Supp. at 96. However, this latter clause overstates the burden traditionally placed on Plaintiffs in similar cases in the First Circuit, under which "[a]ctions, which standing alone do not violate the constitution, may nonetheless be constitutional torts if *motivated in substantial part* by a desire to punish an individual for exercise of a constitutional right." *Id*. at 96 (citing *Thaddeus–X v. Blatter*, 175 F.3d 378, 386 (6th Cir.1999) (en banc)) (emphasis added).[36]

---

[36] In support of its holding that Defendants are not liable if a separate, permissible reason exists, *Price* relied in part on *Graham v. Henderson*, 89 F.3d 75, 79 (2nd Cir.1996). However, this rule misstates the Second Circuit's reasoning in *Graham*, where the Court held that the claim would not survive upon a showing that the plaintiff "would have received the same punishment even if [Defendants] had not been

As discussed on page 24, *infra*, in numerous cases the First Circuit has found that a "reasonable inference of retaliatory animus" is sufficient to overcome summary judgment, even in instances where Defendants contend they had—or could have had—a legitimate purpose for taking adverse action. *See, e.g.*, *Turner v. Wall*, No. 18-1869, 2020 U.S. App. LEXIS 30047, at *9 (1st Cir. May 5, 2020); *Hannon v. Beard*, 645 F.3d 45, 50-51 (1st Cir. 2011); *L'Heureux v. Ashton*, No. 98-1336, 1998 U.S. App. LEXIS 25790, at *3-4 (1st Cir. Oct. 13, 1998). Further, the First Circuit has repeatedly recognized the value of circumstantial evidence in such matters. *See, e.g.*, *Hannon*, 645 F.3d at 49; *Beauchamp*, 37 F.3d at 711; *Ferranti*, 618 F.2d at 892; *McDonald*, 610 F.2d at 18.

Under this authority, Plaintiff has alleged sufficient facts to create a reasonable inference that Defendant Bibeault had retaliatory motive for investigating Plaintiff. Plaintiff's Second Amended Complaint points to multiple circumstances that create a sufficient inference to survive a motion under Rule 12(c), centered on the changes to the investigation that followed Plaintiff filing his Amended Complaint. *See* ECF No. 38 at 17-18 ("No investigatory action by Defendant Bibeault . . . was documented between August 22, 2019 and September 8, 2020"; "Notwithstanding his refusal to make a statement on the record, Defendant Bibeault . . . alleged that John Doe—over a year after making his original statement . . . now decided to implicate Plaintiff."; "According to Defendant Bibeault . . . Jane Doe—over a year after making her original statement . . . now stated that Plaintiff was also involved."). Records produced or published subsequent to the filing of the Second Amended Complaint, including a partial

---

improperly motivated." *Id*. at 80. This is distinct from arguing that the very existence of a permissible reason for an adverse action immediately extinguishes a plaintiff's claim. Rather, in line with the First Circuit's reasoning in the cases cited above, Plaintiff's claim is that Defendant Bibeault would not have taken adverse action against him "but for" retaliatory motive, regardless of whether or not a separate permissible reason existed. The degree to which retaliatory motive was the decisive factor remains an issue of material fact.

transcript of Defendant Bibeault's interview with Destiny Valley in September 2020, provide further circumstantial evidence in support of retaliatory motive. *See* page 29, supra.

Should the Court review Defendant's motion under a summary judgment standard, genuine issues of material fact remain as to what role retaliatory motive played in Defendant Bibeault's criminal investigation of Plaintiff and the subsequent filing of criminal charges by Cpl. Tilson. Further discovery is necessary to understand the course of Defendant Bibeault's investigation, including the circumstances under which Bibeault and Tilson investigated and developed the criminal complaint ultimately filed against Mr. Cintron in District Court.

## V. Request for Leave to Amend Complaint

Were the Court to find deficiencies in Plaintiff's Second Amended Complaint that could be corrected with an amended pleading, Plaintiff moves for leave of the court to so amend under Fed. R. Civ. P. 15. Amendment would be particularly appropriate in this case because no substantive ruling has been issued addressing the original complaint and Plaintiff has gained no advantage from his original pleading. *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003) ("We would not want to institute a rule that unduly inhibits a plaintiff from appropriately adjusting its complaint either to correct errors or to accommodate facts learned during pretrial discovery."). *See also Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 71 (2d Cir. 2014) (*Twombly* would not require that a complaint be dismissed in a 12(c) action if evidence had already been produced during discovery that would fill the perceived gaps in the complaint).

## VI. Conclusion

Departments of Correction are not relieved of their obligation to treat prisoners humanely after they are accused or convicted of a narcotics-related offense. Neither a disciplinary booking, or a plea to time served, extinguishes an individual's constitutional entitlement to "the minimal

civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. Nor does an individual's untreated, near-fatal opioid use disorder justify retaliation by prison officials and contempt by defendants in litigation.

Mr. Cintron spent 30 months in various eight-by-ten-foot boxes with virtually no contact with the outside world. For those years, he routinely faced deprivations of, among other things: fresh air, family contact, education and programming, mental stimulation, and bodily necessities as fundamental as sleep. When he exercised his constitutional right to bring his plight to the attention of this Court, he was punished by Defendants with criminal charges. Blowing past this disturbing set of facts, Defendants characterize this litigation as stemming from the fact that "Plaintiff is upset that he was placed in disciplinary confinement." ECF 50 at 46.

Mr. Cintron is not simply "upset" about his placement in disciplinary confinement. Rather, he is determined to vindicate his rights under the U.S. Constitution, while trying to recover from the ordeal that Defendants put him through. And as traumatizing as he expected bringing suit against Defendants to be, he remains committed to litigation in pursuit of our Constitution's promise that its safeguards should have protected him behind prison walls. He is willing to relive the worst two years of his life in furtherance of this core principle.

At this stage of litigation, Mr. Cintron has alleged a host of facts sufficient for surviving Defendants' Motion for Judgment on the Pleadings. For the reasons outlined in this Response, Plaintiff respectfully asks that this Court deny Defendants' Motion as to Counts 1, 2, 6, and 7.

Plaintiff,

By his attorneys,

/s/ Natalia Friedlander
Natalia Friedlander (#10003)
Jennifer L. Wood (#3582)

Jonathan Cohen (#10494)*
Rhode Island Center for Justice
One Empire Plaza, Suite 410
Providence, RI 02903
Tel: 401.491.1101 | Fax: 401.228.6955
nfriedlander@centerforjustice.org
jwood@centerforjustice.org

*Admission pending

May 26, 2022